## RICKER NAT. BANK v. STONE.

No. 691, Ind. T.   Opinion Filed September 8, 1908.

(97 Pac. 577.)

1.  **PRINCIPAL AND AGENT—Authority—Question for Jury.** The apparent authority of an agent is to be gathered from all the facts and circumstances in evidence, and is a question of fact for the jury.

2.  **BANKS AND BANKING—National Banks—Authority of Agents.** A national bank has power under the banking laws of the United States, to intrust to its agents such authority as is required to meet all the legitimate demands of its authorized business and to conduct its affairs within the scope of its charter safely and prudently.

3.  **PRINCIPAL AND AGENT—Authority of Agent—General Scope.** Authority, whether general or special, conferred upon an agent, is to be construed as including only the usual means appropriate to the end. Even if a general discretion is vested in an agent, it is not deemed to be unlimited. It must be exercised in a reasonable manner, and cannot be resorted to to justify acts which the principal could not be presumed to intend.

(Syllabus by the Court.)

*Appeal from the United States Court for the Southern District of the Indian Territory, Sitting at Chickasha; J. T. Dickerson, Judge.*

Action by R. E. Stone against the Ricker National Bank. Judgment for plaintiff. Defendant appeals. Modified.

*Charles M. Fechheimer* and *Gilmore & Brown,* for appellant. *Gilbert & Bond,* for appellee.

KANE, J. .This was an action commenced by the appellee, plaintiff below, against the Ricker National Bank, the appellant, defendant below, to recover a certain sum of money which the plaintiff alleged was due him from the defendant on account of

personal services rendered.  It seems that during the year 1900 and thereafter the defendant employed one G. M. Smith to solicit loans for it at the stockyards at Kansas City, Mo.; that said Smith also kept a general oversight of its loans on cattle, with a view to the preservation of the security and the protection of the interests of the bank.  During the year 1900 Maxwell & Morris and Blanton & Morris were engaged in the cattle business in the Chickasaw Nation, Indian Territory, and borrowed from the defendant large sums of money, which were secured by chattel mortgages on cattle located in the Indian Territory.  In the latter part of the year 1902 the defendant became uneasy about the condition of their security, and placed the same for investigation and action in the hands of their agent, G. M. Smith; the defendant being informed that Maxwell & Morris and Blanton & Morris were not in a condition financially to procure feed and care for the cattle during the winter months of 1902-03, and that mortgages subsequent to theirs had been executed in favor of parties at Kansas City, making it impossible to take additional security or new mortgages without making them subsequent and inferior to the mortgages held by the Kansas City parties.  In order to get means to winter the cattle covered by their first mortgage, negotiations were entered into between Maxwell & Morris and Blanton & Morris and the defendant, which resulted in an agreement on the part of the defendant to loan Maxwell & Morris and Blanton & Morris about $20,000, to be used in caring for the cattle during the winter.  Maxwell & Morris and Blanton & Morris accordingly executed their notes to appellant for about $20,000 and secured the same by mortgages on their cattle.

It appears from the evidence that there were other cattle than those covered by the mortgages mixed with the cattle upon which the appellant held their mortgages, from which it was necessary for the appellant to protect the feed for which they were paying.  In order to be assured that the funds so to be advanced by appellant were applied in caring for the cattle covered by appellant's mortgages, G. M. Smith sent J. M. Edelen to the In-

dian Territory, to remain with the cattle and to see that the funds advanced were properly applied. Later said Smith recalled said Edelen and sent one Daniel Callahan to the Indian Territory to take his place. The funds were held by G. M. Smith, and, when it was necessary to have money for the purpose of buying feed or making other provisions for the care of said mortgaged cattle, Blanton & Morris or Maxwell & Morris would make a draft on G. M. Smith at Kansas City for the amount of money then required, and submit this draft to Edelen or Callahan, with a statement of the purposes to which the money was to be applied, and Edelen or Callahan would O. K. the draft, and it would be forwarded to Kansas City for collection and paid by Smith out of the $20,000 loan. The evidence also shows: That appellee had been in charge of the cattle, about 5,000 head, in which the appellant held something over $100,000 interest, since October, 1900, or three years prior to the institution of this suit. That he was foreman, and had control of and was familiar with the cattle, their location, etc. When Edelen went to the Indian Territory in November, 1902, the appellee was still so employed. At that time, about the 15th or 20th of November, 1902, Edelen requested appellee to remain and work with the cattle covered by appellant's mortgages, and according to his complaint he began work under his contract with Edelen on the 20th day of November, 1902. That, in order to procure his services as foreman of the ranch on which the cattle were located, the appellant, through its agents, Edelen and Smith, bargained with the appellee that they would pay him all back wages then due him from Maxwell & Morris and Morris & Blanton, the amount of which at that time was unascertained, but which the appellee stated was a big amount, and would pay him from that time on until such time as the cattle should be disposed of the sum of $50 per month and all expenses. That he earned after commencing his employment the sum of $625.

The defendant denied its liability, and on the issues thus joined the case was tried before a jury, and a verdict was returned in favor of the plaintiff in the sum of $1,250. The court ordered

a *remittilur* of $150 from the verdict, which *remittitur* was en-
tered by the plaintiff, and a judgment rendered for the sum of
$1,100.   From this judgment the appellant appealed to the Court
of Appeals of the Indian Territory, and the case was transferred
to this court under the terms of the Enabling Act and the Schedule
to the Constitution.

The appellant's specification of error contains eight assign-
ments; but, as counsel confined his argument to two of these, we
do not deem it necessary to notice the others.   Counsel for ap-
pellant, in his brief, states his position as follows:

"The appellant, not waiving its other specifications of error,
.desires to address its argument for a reversal of this cause chiefly
to two propositions:   First.   The court erred in refusing to give
the peremptory charge requested by the appellant.   Second.   If
this court shall be of opinion that the appellant's request for a
peremptory charge was properly refused, nevertheless the judgment
is excessive by at least the sum of $625, and to that extent at
least is not supported by the evidence and is contrary to law.   As
shown in the opening statement, the quotations from the appellee's
petition, and from his testimony, the $1,100 at which the judg-
ment now stands is made up of two items:   First, of $625 claimed
to have been earned by the appellee as an employe of Maxwell &
Morris before he entered into the pretended contract with Edelen;
and, second, of the sum of $475 claimed to have been earned by
the appellee while he was working under the pretended contract
with Edelen."

On the first proposition the question of the agency of Edelen
and Callahan was submitted to the jury, and, as there was some
evidence to show that their authority was broad enough to em-
power them to employ men for the purpose of taking care of the
defendant's interest in the mortgaged property, that question must
be deemed to be settled.   "The apparent authority of the agent
is to be gathered from all the facts and circumstances in evidence,
and is a question of fact for the jury."   1 Am. & Eng. Enc. of
L. (2d Ed.) 990; *Nicholson v. Golden*, 27 Mo. App. 132.   That
a national bank has power under the banking laws of the United
States to intrust to its agent such authority as is required to meet

all of the legitimate demands of its authorized business, and to enable it to conduct its affairs within the general scope of its charter safely and prudently, is settled by a long line of well-considered decisions. Mr. Chief Justice Waite in *First National Bank of Charlotte v. National Exchange Bank of Baltimore*, 92 U. S. 122, 23 L. Ed. 679, in construing the powers of national banks under the national banking laws of the United States (Act June 3, 1864, c. 106, 13 Stat. 99), says:

"Authority is thus given to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs within the general scope of its charter safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others. Its own obligations must be met, and debts due to it collected or secured."

To our mind that part of the contract made by the agent of the bank employing the appellee to protect the cattle held as security at a stipulated wage per month was entirely within the scope of his authority, and such power was safely and prudently exercised. The appellee, therefore, was justly entitled to compensation for his service at the rate of $50 per month for the time he was employed.

On the second proposition we see no room for the application of the above principal. The circumstances of his employment are stated by the appellee in his evidence as follows:

"He [Edelen] says: 'Mr. Stone, I understand you are thinking about quitting Capt. Morris?' I says: 'Well, under the conditions, I am; yes, sir.' He says: 'I do not see how in the world Capt. Morris can do without you, and we have got to have you here.' I says: 'Mr. Edelen, there is only one way you can keep me here, and that is to pay me what Capt. Morris owes me.' He says: 'I will agree to pay you.' He says: 'You stay here. If your salary isn't sufficient, I will make it so.' I says: 'So far as my salary is concerned I will stay with Capt. Morris for the same salary.' He says: 'What is your salary?' I says: '$50 a

month.' He says: 'I wouldn't think you would have worked for $50 a month.' I says: 'I will stay for $50 a month for Capt. Morris' sake.' I says: 'Will you pay me from now on, or pay me back salary?' He says: 'We will pay you what Capt. Morris owes you, and pay you for your time from now on.'"

Mr. Stone also testified as follows:

"Q. Did you tell Mr. Edelen in 1902, when he came out there, how much Capt. Morris owed you? A. I told him Capt. Morris owed me a big amount of money. Q. You never told him any amount? A. No, sir; I told him: 'Capt. Morris owes me a big amount of money. He has paid me very little.' Q. Then you want this jury to understand that Edelen agreed to pay you whatever Maxwell & Morris owed you, without knowing how much that was? A. Mr. Edelen guaranteed my money. Q. Answer my question. A. Yes, sir. Q. Do you want to tell the jury that? A. I want to tell the jury that; yes, sir."

We believe that the facts as above stated did not constitute a contract of guaranty; that the sole object of the agent, Edelen, in promising to pay the debt of Maxwell & Morris and Blanton & Morris, was to promote the interest of the bank in procuring the services of the appellee and not to make it guarantor. Guaranty is defined by Mr. Black in his Law Dictionary (page 550) to be:

"A promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another person, who, in the first instance, is liable to such payment or performance. A guaranty is an undertaking by one person to be answerable for the payment of some debt, or the due performance of some contract or duty, by another person, who himself remains liable to pay or perform the same."

There are none of the elements of guaranty as above defined in the contract entered into by Mr. Edelen and the appellee, and the contract, therefore, must be treated as one of hire. But the authority to employ men, in the absence of an express authorization to do it in an unusual manner and upon unusual terms, carried with it only the power to hire upon usual and ordinary terms. Even a general agent cannot enter into contracts of an unusual and extraordinary character without special authority.

Mr. Mechem, in his work on Agency (section 395), discussing the powers of a general managing agent, says:

"In general terms it may be said that such an agent has implied authority to do those things which are necessary and proper to be done in carrying out the business in its usual and accustomed way, and which the principal could and would usually do in like cases if present."

Mr. Story, in his work on Agency (9th Ed., § 83), discussing the same subject, says:

"If the authority is special, it is construed to include only the usual means appropriate to the end. If the authority is general, it is still construed to be limited to the usual means to accomplish the end. Even if a general discretion is vested in the agent, it is not deemed to be unlimited; but it must be exercised in a reasonable manner, and cannot be resorted to in order to justify acts which the principal could not be presumed to intend."

Granting that Edelen had authority to hire men to look after the Maxwell & Morris cattle, he was not thereby authorized to bind his principal by an unusual contract, which from the very nature of the business it could not be supposed his principal would undertake to enter into. Authority, whether general or special, conferred upon an agent, is to be construed as including only the usual means appropriate to the end. Even if a general discretion is vested in an agent, it is not deemed to be unlimited. It must be exercised in a reasonable manner, and cannot be resorted to to justify acts which the principal could not be presumed to intend. *Express Company v. Trego*, 35 Md. 47. *Doan, King & Co. v. Duncan*, 18 Ill. 96, is another case where the principle applicable here is well stated:

"A clerk who sells goods, keeps books, and assists generally under the supervision of his employer, has not, from the fact of his employment, authority to purchase goods abroad on the credit and account of his principal. Only such powers are presumed to be confided to a clerk as, in view of the usual course of trade, are necessarily and usually exercised by other clerks in the same line of business, and as are adapted to the purposes of his employment."

Mr. Justice Skinner, who delivered the opinion for the court, further says:

"A different rule of law from what is here declared would subject merchants to ruin by foreign purchases of clerks, employed with no intention to confer upon them power to act beyond the ordinary business incident to the sale of goods at the place where the merchant is located."

The appellee, in the case at bar, had been working for $50 a month for several years prior to his contract with Edelen, and $50 per month was the value he placed upon his own services under his contract with Edelen. The payment of the big amount that Maxwell & Morris owed him was not to be taken as compensation for his services, but merely as an inducement for him to remain in the employment of the bank an indeterminate period of time. According to his own statement he was not employed for a week, month, or a year, or any other definite time. He might have quit at the end of any of these periods, and claimed payment for the full amount of the bonus. To permit this latitude to an agent of a national bank clothed with authority to hire men to perform such duties as the appellee, by the nature of his employment, was called upon to perform, might very well subject it to ruin, and probably visit serious consequences upon its depositors and stockholders. Mr. Chief Justice Shaw, in *Shaw et al. v. Stone et al.*, 1 Cush. (Mass.) 228, states the principle as follows: "A general agent for buying and selling cannot, without special authority, resort to extraordinary and expensive means to raise money for its principal." The case of *Lumber Company v. Moffat*, 134 Fed. 836, 67 C. C. A. 442, involved the same principle. In that case the facts were that the Chicago Lumber Company, of Denver, became insolvent, owing the Pacific Lumber Company $2,700. Moffat, the defendant, acquired the business of the Chicago Lumber Company, and employed one Vreeland as his agent to manage the business, with authority to buy and sell lumber. Vreeland made a contract in Moffat's name with the plaintiff for the purchase by Moffat from plaintiff of 90 cars of

shingles at a specified price, which was 20 cents per 1,000 above the market price for shingles, making a total of $2,700 in excess of the then market price; the purpose being to have Moffat indirectly assume and pay the $2,700 debt of the Chicago Lumber Company. Moffat received and paid for part of the shingles, and then, learning the facts, repudiated the contract. In the suit on the contract it was held that the contract was void and plaintiff could not recover. Judge Lochren, who delivered the opinion of the court, in speaking of the power of a general agent to bind his principal under the above state of facts, says:

"Vreeland's authority as agent to purchase and sell lumber and shingles and to manage that business for defendant, however general, did not authorize him to obligate and bind his principal to pay the debt of another."

The case most pointedly illustrating the principle governing the case at bar called to our attention is *Holloway v. Stephens et al.*, 2 Thomp. & C. (N. Y.) 562. The facts were that the plaintiff was engaged in the business of manufacturing, advertising, and selling patent medicines. One Haydock was his managing agent. The amount of the annual business was about $50,000. Haydock, in behalf of plaintiff, Holloway, made a contract with the defendant Stephens for advertising plaintiff's business and remedies in Mexico and South America at an expense of about $130,000 yearly. Holloway brought suit against Stephens for a rescission of the contract and to enjoin him from prosecuting suits upon it. The trial court gave Stephens judgment for breach of the contract. In reversing that judgment Mr. Justice Daniel, who delivered the opinion of the court, says:

"The agent was authorized to do whatever was requisite and necessary to be done in and about that business as fully as the plaintiff might do in case he was personally present. This conferred upon the agent all of the powers the business itself could indicate that he possessed to persons dealing with him. They could infer no greater authority from the manner in which the business would ordinarily be carried on. This made the agent a general one, but at the same time his powers were, in either view,

limited to what was required to be done in the management and transaction of the business under his control; for even a general agent cannot bind his principal for the performance of any act beyond the apparent and ostensible scope of his authority. He is to be presumed to have all the power which the nature of the business he may be engaged in requires to be used; but, when he exceeds such powers, even the acts of a general agent will fail to bind his principal, for third persons have no reason to suppose that powers not properly exercised in the business intrusted to him have been conferred even on a general agent by his principal. * * * How the advertisement of such a business in foreign languages and in foreign countries to the extent agreed upon between the plaintiff's agent and the defendant can be brought within the scope of the agent's own power is not made to appear from the case presented."

On the same subject Justice Daniels further says:

"These agreements stipulated for the advertisement of plaintiff's compounds for a period of two years at an expense exceeding $130,000 per year. While it is not necessary to decide the point now, it can hardly be conceived to be possible that the credulity of the defendant would have permitted him to suppose that the plaintiff's business could require such an expenditure, or that his agent had any power to incur it."

While the amount involved in the case at bar is not a large one, yet the principle is the same, and if it was conceded that the agent, authorized to hire men for his principal, could, in addition to contracting for the payment of ordinary and usual wages per month, also bind his principal to pay an unliquidated sum due the employe from a former employer, merely to induce the employe to continue in the service for an undetermined length of time, it would throw down the bars to fraud, and permit a looseness in the business transactions of banking concerns which we are satisfied the law and facts of this case do not warrant. If the contention of the appellee was granted, the sum of $625 would become due immediately upon his continuing in the service of the bank for one day, and the amount due could as well be $1,000 or $10,000 as the amount he sued for.

Counsel for appellee argues that the appellant had more than $100,000 invested in the cattle hundreds of miles away from its principal place of business. It was informed that the mortgagors were in such financial condition that they could not procure feed for the cattle and care for them during the winter months. They sent their agent to make an investigation, and clothed him with authority to use his best judgment in the matter at that particular moment and report. He finds the cattle on the ranch in charge of a man familiar with them and who had exercised control over them since 1899. He knows that this man is necessarily the proper man to continue in control of the property of his principal. Confronted with this condition of affairs, if it was necessary for him to pay a debt for labor previously contracted upon these cattle in order to obtain the services of a man necessary to his principal, would the contract be supported by sufficient consideration? We have answered counsel's question in the negative, basing our answer upon the facts as they have been found by the jury; but even on the hypothesis stated by counsel we must still answer in the negative. The evidence does not show such an emergency as would warrant the agent in making such an extraordinary and unusual contract in order to procure the necessary labor to protect the interests of his principal. There is no question but fair and reasonable compensation for the services of appellee would have been $50 per month. That was what he had been receiving before his contract with Edelen, and that was what he thereafter held his services to be worth. The big amount that Morris & Maxwell owed him for previous services was merely to induce him to take employment with the appellant, without any showing or pretense that his services were indispensable, or that the nature of the employment was such that the interest of the bank would be seriously jeopardized if he did not accept the employment. It seems to us that it can hardly be conceived to be possible that the credulity of appellee would have permitted him to suppose that the agent of the Ricker National Bank had any power to make such an unusual contract.

The judgment of the court below will therefore be modified, by setting aside that part thereof allowing the appellant the sum of $625 alleged to have been due him from Maxwell & Morris and Blanton & Morris, and is affirmed in all other particulars.

All the Justices concur.