## AMAZON FIRE INS. CO. v. BOND.

No. 6508—Opinion Filed Jan. 16, 1917.

Rehearing Denied May 29, 1917.

(165 Pac. 414.)

**1. Pleading— Inconsistent Allegation—Election.**

Where one of the issues to be determined was agency, and the petition alleged in one paragraph that the agency existed, and in another paragraph that the act of the party assuming to act as agent had been ratified, the court properly refused to require the plaintiff to elect upon which he would stand.

**2. Appeal and Error—Discretion of Lower Court—Trial—Amendment.**

Amendment during the progress of the trial is discretionary with the trial court, and, unless same is an abuse of discretion, it will not be disturbed here.

**3. Evidence—Fraud—Admissibility of Other Misrepresentations.**

In an action for fraud, representations made by the supposed agent to other parties,

about the same time and place, as to the value of the stock sold, are competent, for the same tend to show a definite plan or system to defraud.

**4. Fraud—Fraudulent Representations—Action—Sufficiency of Evidence.**

Upon an examination of this record, we cannot say that this evidence, and the proper inferences to be drawn therefrom, do not support this verdict.

(Syllabus by Hooker, C.)

Error from Superior Court, Pittsburg County; W. C. Liedtke, Judge.

Suit by Robert I. Bond against the Amazon Fire Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Stanard, Wahl & Ennis, for plaintiff in error.

W. J. Hulsey and Clayton & Clayton, for defendant in error.

Opinion by HOOKER, C. The defendant in error sued to rescind a contract, and for damages for fraud and deceit alleged to have been caused him by reason of false and fraudulent representations and statements having been made to him by the agents of the Western & Southern Fire Insurance Company, as the result of which he purchased from the company through its agents 100 shares of stock in said company at $25 per share, in payment of which he executed two notes, for $1,500 and $1,000, respectively, due in one year, with 5 per cent. interest, payable to himself and indorsed by himself. The defendant company denied the authority of the parties making the sale to act for it in any capacity, and denied that it had sold to plaintiff any stock or had any transaction with him. Upon this issue, under proper instructions of the court, this cause was presented to the jury, and a judgment was rendered in favor of plaintiff, to reverse which the company has appealed, assigning the following errors:

(1) That the court erred when it refused to require the plaintiff to submit his cause upon one theory.

(2) That it was error to permit plaintiff below to amend his petition in the progress of the trial, so as to state a cause of action.

(3) The refusal of the court to give requested instructions, and likewise error in giving certain instructions.

(4) No evidence to support the verdict of the jury.

(5) The admission of incompetent evidence over its objection.

The evidence here discloses: That in the summer of 1909 one Edmund Dwyer and one

Blanchard, representing themselves to be agents of the Western & Southern Fire Insurance Company, solicited plaintiff to purchase stock in said company, but he was not at the time interested. That about December 1, 1909, they again visited him for said purpose, but were unsuccessful. About January 27, 1910, they again visited Dr. Bond and sold to him 100 shares at $25 per share, in payment of which he executed and delivered his two notes as stated above. That said notes, at the instance of Dwyer, were drawn payable to Dr. Bond, and indorsed by him, and delivered to Dwyer. At this time Dwyer gave to Dr. Bond the following receipt:

"Receipt for Stock Settlement.
"Western & Southern Fire Insurance Company, Shawnee, Oklahoma."

"Book No. 130.

"Application and Receipt No. 12.

"Received of Dr. Robert Bond ($2,500.00) twenty-five hundred dollars, in payment for 100 shares of the capital stock of the Western & Southern Fire Insurance Company of Shawnee, Oklahoma. This receipt is issued subject to the contract of purchase of duplicate number. Only salesman No. 9, whose signature appears on the inside front cover of this book, has authority to countersign this receipt.

"Signed this 27th of January, 1910.

"Western & Southern Fire Insurance Co.,

"By Edmund Dwyer."

And indorsed upon the back of said receipt was the following:

"Should the purchaser of the stock indicated on this application, and for which he has given his notes for $2,500.00 and due in 12 months from date, desire to renew all or part of his notes, he has the right to do so at 5 per cent. per annum.

"Edmund Dwyer, Agt.

"Jany. 27, 1910."

Dwyer and Blanchard took the $1,500 note and discounted the same to the McAlester Trust Company, along with other notes, and they stated to the president of the bank at the time they were agents of the Western & Southern Fire Insurance Company, and the president of the bank in payment of said notes caused some certificates of deposit in the name of the company to be given to Dwyer and Blanchard. These certificates of deposit were all later indorsed by the Western & Southern Fire Insurance Company and paid by the McAlester Trust Company. The $1,000 note, a short time after its execution, was in the possession of and owned by the company, and was so owned by it at the time

of the institution of this suit, and also its property when renewed in January, 1911, and interest paid thereon. The evidence further shows that Dwyer and Blanchard held in their possession at the time of the sale to plaintiff—

"various forms of contract of the Western & Southern Fire Insurance Company and various reports and other literature of the company, such as any agent engaged in the sale of stock would have."

Plaintiff paid the larger note at maturity, and procured in January, 1911, a renewal of the $1,000 note, and paid the interest thereon, and when this note was about due he wrote the company, and requested it to send same to the bank at Hartshorne and he would pay it, but changed his mind and instituted this suit to recover the sums paid out by him, and to cancel the outstanding note, claiming he had just ascertained the fraud; that is, that in 1912 he first ascertained that the statement made in 1909 by Dwyer and Blanchard as to the Western & Southern Fire Insurance Company having purchased or acquired the interest of the Shawnee Mutual Fire Insurance Company was false, and that as soon as he discovered the same he brought this suit. It is asserted that said parties stated that the Western & Southern Fire Insurance Company had acquired the business of the Shawnee Mutual Fire Insurance Company, which was then a going concern, and there is some evidence supporting the theory, had this been true, the stock in the Western & Southern Fire Insurance Company would have been more valuable.

The evidence also discloses that, while these negotiations were being made by Dwyer and Blanchard with Dr. Bond for the sale of said stock, they conversed with other parties in Hartshorne, and stated to them that they were agents of the company for the purpose of selling the stock, and that they sold some of the stock to other parties and took notes in part payment, and that these notes later were in the possession of the company and claimed by it. The company asserted that one J. C. Chrisney had subscribed for a large number of its shares and had not paid therefor, nor had said stock been issued to him, and that he employed Dwyer and Blanchard, as his agents, to sell stock, and that when the stock was sold by him, and notes taken therefor and delivered to Chrisney, he would transfer said notes to it, and it would credit his account therefor, and that in this way it acquired the ownership of the various notes, etc., involved here.

Upon this evidence this cause was presented to the jury, and it, after hearing the evidence, found that Dwyer and Blanchard

were the agents of the company, and that they had made the statements claimed. and same were false.

The petition alleges that the company is liable for two reasons: First, because Dwyer and Blanchard were specifically authorized to act for it; second, if not specifically authorized, the company ratified the acts of Dwyer and Blanchard by accepting the benefits of the transaction. These are not inconsistent causes of action.

The Western & Southern Fire Insurance Company was acquired after this transaction by the Amazon Fire Insurance Company, but the stock purchased by plaintiff was never delivered to him at any time. In the case of Austin Mfg. Co. v. Decker, 109 Iowa, 277, 281, 80 N. W. 312-314, the Supreme Court of Iowa said:

"The whole doctrine of election is based upon the theory that there are inconsistent rights or remedies of which a party may avail himself, and a choice of one is held to be an election not to pursue the other. The principle does not apply to coexistent remedies."

In the instant case the fact to be established was the agency of Dwyer and Blanchard on behalf of the company, or subsequent ratification, and the cause of action of Dr. Bond can be maintained, if he can establish they were the agents in the first instance, or that they assumed to act for the company, and that the company subsequently ratified their acts  In either event, the court did not commit any error in refusing to require the defendant in error to elect in this case.

Under our Code the amendment of the pleadings is discretionary with the trial court, and unless the same constitutes an abuse of discretion this court will not interfere with the action of such trial court in permitting an amendment. It is true that here, during the progress of the trial, the court permitted the defendant in error to amend his petition so as to make the same state a cause of action. The plaintiff in error did not show, nor attempt to show, the trial court where this was prejudicial to its interests, nor did it claim in the court below that it was surprised by this amendment, and a full consideration of the record does not disclose that there was an abuse of discretion in this respect. Section 4790, Revised Laws 1910, affords abundant authority to sustain the action of the trial court in permitting such amendment.

Upon the trial the court permitted the defendant in error to show that the purported agents of the company, Dwyer and Blanchard, had made other sales of its stock to parties in the locality of Hartshorne about the time of the sale to the plaintiff below, and also permitted said parties to testify to the representations made by said purported agents at the time. This was objected to by the plaintiff in error in the trial below, and is assigned here as one of the reasons why this judgment should be disturbed. In 17 Cyc. 287, it is said:

"An attendant circumstance of highly probative value may in some cases be found in the existence of such a series or system of co-ordinated or correlated facts as lead to the inference that the particular act which is under investigation must have been done as a necessary part of a general plan to attain a definite object, and that it was done by the person to whose real or supposed interest the particular act would redound. The acts or other facts constituting such an attendant circumstance may be shown, to indicate the existence of a systematized plan or comprehensive design, and they may be shown, notwithstanding the fact that the various acts cover an extended period of time."

This rule seems to be well supported by the authorities cited in the note to the text above given. It seems to us that this testimony was competent to show a wholesale system on the part of Dwyer and Blanchard to sell the stock of the company, and clearly evidences a total disregard of the truth, and indicates a settled conviction upon their part to sell stock, regardless of the representations necessary so to do.

In Mechem on Agency, vol. 1 (2d Ed.) 188, it is said:

"So evidence of agency is also found in the facts that the alleged principal has acquiesced in, recognized, or adopted similar acts done on other occasions by the assumed agent. Where the acts so adopted are so closely connected as to constitute a course of dealing or to establish a custom, there can usually be but little difficulty; neither can there be where the acts are so numerous or so closely related as to reasonably lead to no other conclusion than that of a general agency of the doing of the acts of that character."

If there is any evidence supporting this judgment we cannot disturb the same. The question of agency is one of fact, to be decided from all the facts and circumstances surrounding the transactions. It is often quite difficult to establish positive authority, and the power of the agent can only be determined by a critical examination of the entire transaction. When one starts out in an enterprise to defraud, often almost every known effort is resorted to in order to conceal and hide the fraudulent conduct. If lia-

bility can be averted, or suspicion shifted to others, it is a perfect defense. In the instant case, the company by its own admission permitted Chrisney to subscribe for a large number of its shares, knowing full well that before he could pay therefor he would have to sell the same to others, and that he was selling same as rapidly as possible, and that he was turning to it money and notes to be applied in settlement for stock for which he had subscribed.

Dwyer traveled over the country, assuming to be its agent, executed contracts in its name, sold stock, and represented he was selling same for the company, and if for a private individual he concealed the same from the purchasers, accepted notes in payment therefor, and these notes afterwards were in the possession of the company; he had contracts and other literature of the company in his possession, such as a stock salesman would have, and in some instances the stock sold by Dwyer was delivered to the purchaser by the company, and Dwyer also discounted notes and accepted certificates of deposit in the name of the company therefor, which the company afterwards indorsed and collected, and some of which were indorsed by Dwyer, as agent of the company, and some of same deposited in the bank to the credit of the company, and afterwards paid to the company.

The company did not fully inform the purchasers from Dwyer as to its condition when requested, and it is apparent that any efforts upon the part of the company would have fully discovered the representations made by Dwyer in making his sales. It appears the company diligently sought to avoid knowledge, content to revel in the wickedness of Dwyer and others and profit by their iniquity. This court in the following cases: Port Huron Co. v. Ball, 30 Okla. 11. 118 Pac. 393; Ricker Nat. Bank v. Stone, 21 Okla. 833, 97 Pac. 577; Mullen v. Thaxton, 24 Okla. 643. 104 Pac. 359; Allen v. Kenyon. 30 Okla. 536. 119 Pac. 960—said that the apparent authority of an agent is to be gathered from all the facts and circumstances in evidence, and is a question of fact for the jury. Also in U. S. F. & G. Co. v. Shirk et al., 20 Okla. 576, 95 Pac. 218, this court said:

"One who, by his conduct, has led an innocent party to rely upon the appearance of another's authority to act for him, will not be heard to deny the agency to that party's prejudice."

And that:

"One who voluntarily accepts the proceeds of an act done by one assuming. though without authority. to be his agent. ratifies the act, and takes it as his own, with all its burdens, as well as all its benefits."

In Midland Savings & Loan Co. v. Sutton, 30 Okla. 448, 120 Pac. 1007, it is held:

"1. The question of agency and the extent and scope of the agent's authority are to be determined by the jury, as other facts, from the evidence.

"2. The apparent authority of an agent is to be gathered from all the facts and circumstances in evidence, and is a question of fact for the jury.

"3. One who leads an innocent party to rely on the appearance of another's authority to act for him will not be heard to deny the agency to the party's prejudice. * * *

"6. Where there is evidence reasonably tending to sustain the issues on the part of the plaintiff, and the evidence on the part of the defendant conflicts therewith, the determination thereof is for the jury."

And in Fant v. Campbell, 8 Okla. 586. 58 Pac. 741, it is said:

"The act of one who assumes to act for another, though without authority, may be ratified by the one for whom he assumes to act voluntarily accepting the proceeds or profits of such unauthorized act. * * *"

This court also in Minneapolis Threshing Machine Co. v. Humphrey, 27 Okla. 697, 117 Pac. 203, 204, said:

"As the question of ratification or confirmation was submitted to the jury, and they found in favor of the defendant Burke on that question, if there is any evidence reasonably tending to support their finding, it will not be disturbed by this court. It is a general rule that evidence of any conduct on the part of the principal recognizing the acts of the agent is admissible. * * * There was evidence to the effect that. immediately upon the execution of the release by Davies, the threshing machine was turned over to Humphrey. and remained in his possession until taken from him by the threshing machine company. * * * All these circumstances, we think. tend to contradict the evidence of the president to the effect that the actions of Davies in executing the contract of release were never ratified or confirmed by the company. and join an issue of fact for the jury. It is true that evidence of knowledge of these facts by the company is essential to a ratification. but such knowledge may be presumed when the acts of the agent are of such a nature that the principal must have known of them. * * * Ratification of an unauthorized act of an agent may be presumed from long-continued silence of a principal who has knowledge of the facts constituting such ratification. * * * In Hatch v. Taylor, 10 N. H. 538. it was held that evidence of conduct may be admitted. and be sufficient to establish ratification. notwithstanding the principal expressly declared he would not sanction the contract. In Patterson v. Van Loon. 186 Pa.

367, 40 Atl. 495, the court said: "The evidence necessary to establish such relation is very different from that required to prove an express agency. In the former greater latitude must necessarily be allowed in the admission of testimony tending to prove facts and circumstances from which the existence of an agency may be legitimately inferred. From the nature of the case, evidence that would tend to prove an implied agency, or subsequent ratification, would be admissible as proof of an express agency."

In Iowa Separator Co. v. Sanders, 40 Okla. 658, 140 Pac. 406, 407, this court said:

"Counsel takes the position that all the evidence on the part of the defendant regarding agency was incompetent, and therefore, if his objections had been sustained to the introduction of such evidence, there was no other evidence sufficient to authorize the submission of the issues to the jury. While it is true, as a general rule, that, until some evidence of agency has been introduced, declarations of an assumed agent, seeking to establish agency, are incompetent. There are exceptions to this rule, however, and one of the exceptions is that where the suit is based upon a contract entered into by the alleged agent, the declarations of the agent are admissible and competent testimony. * * * In the case at bar, in addition to the fact that the suit was based upon a contract entered into by Hustin, the alleged agent, there were other circumstances and testimony tending to prove agency. * * * In view of these facts, we are of the opinion that the court did not err in admitting the testimony complained of, and that there was sufficient testimony, warranting the submission of the issues to the jury. Where there is any controversy about the facts, the question of agency is an issue for the determination of the jury."

Ratification, as it relates to the law of agency, may be defined as the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another, who at the time assumed to act as his agent in doing the act or making the contract without authority to do so. And it is stated that as a general rule, in order that a ratification of an unauthorized act or transaction of an agent may be valid and binding, it is essential that the principal have full knowledge of all material facts and circumstances relative to the unauthorized act or transaction, or that some one authorized to represent the principal, except the agent, have such knowledge, unless the principal is willfully ignorant or improperly refrains from seeking information.

The lack of full knowledge does not protect a principal, who is willfully ignorant and deliberately chooses to act without such knowledge, as where, knowing that he is igno-

rant of some of the facts, he has such confidence in his agent that he is willing to assume the risk and to ratify the act without making inquiry for further information than he at the time possessed, or where he intentionally and deliberately ratifies without full knowledge under circumstances which are sufficient to put a reasonable man upon inquiry, and the principal cannot ratify that part which is beneficial to himself and reject the remainder, for with the benefits he must take the burden, and if the circumstances are sufficient to put a man of reasonable prudence upon inquiry, the principal should make every reasonable effort to discover whether another has assumed to act in his behalf. In Blakley v. Cochran, 117 Mich. 394, 75 N. W. 940, it is held:

"It is contended that, before ratification can be shown, it must appear that the principal has full knowledge of the transaction. **This knowledge may be inferred from the circumstances proven.**"

In the case of Lee v. Kirby, 80 Ark. 366, 97 S. W. 298, the Supreme Court of Arkansas said:

"A partnership dissolution agreement, releasing plaintiff from all debts of the firm, was signed by L., defendant's brother, for himself and for defendant. In an action to compel reimbursement for debt paid by plaintiff after dissolution, defendant claimed that L. had no authority to bind him by such contract, but testified that they both signed the contracts for the firm as they desired; that L. had charge of the business, so far as the interest of both in the partnership was concerned, and frequently signed the name of L. Bros. to notes, the validity of which was never disputed, but was expressly recognized. Defendant also knew that plaintiff had been released from the partnership on some terms, but made no inquiry as to what such terms were. Held, that defendant had ratified his brother's act, and was bound by the contract of dissolution."

And in the body of the opinion the court said:

"He was thereupon put upon inquiry as to the terms of the dissolution, and by failing to inquire, or object to the terms, is deemed, under the circumstances, to have assented to and affirmed the contract made in his name by his brother."

In the case of McDermott v. Jackson, 97 Wis. 64, 72 N. W. 375, the Supreme Court of Wisconsin said:

"The principle that a person cannot retain the avails of an unauthorized contract made for his benefit by another, assuming to act as his agent, and repudiate the responsibilities of such contract, and that any attempt so to do, with full knowledge of the facts, constitutes a ratification of the unauthorized act.

and creates a liability on the part of such person to the same extent as if such contract were originally authorized, is familiar. * * * This principle applies where the agent, in excess of his authority, borrows money on the credit of his principal and with it discharges debts of the principal in the business in which such agent is engaged. * * * The facts upon which the first case [Perkins v. Boothby, 71 Me. 91] turned are stated in the opinion of Symonds, J., as follows: 'The duty of the agent was to have charge of the store, sell the goods, and from time to time make such purchases of goods as might be necessary in his judgment, subject to the oversight of the directors. In the conduct of the business of the company, he assumed to borrow for them and to pay their debts for goods that had been purchased.' * * * In discussing the general principle before stated, the court quoted with approval from Green's Brice, Ultra Vires, 618, as follows: 'There appears to be no substantial reason whatever for not extending the principle here involved to all analogous cases. If liable in one case, why should a corporation not be always liable to refund the property or money of a person, which it has obtained improperly, or without consideration, or, if unable to return it, to pay for the benefit obtained thereby.' The conclusion reached was that such principle was applicable to the facts of that case, and that plaintiff was entitled to recover the money borrowed, as for money had and received. 'We perceive no good reason why the principle should not be held to apply here. Defendant had the full benefit of plaintiff's property. To the amount of such property he was relieved from liability to others, which, but for such property, he would have been obliged to pay. A refusal to return the money, with knowledge of the facts, or with notice and sufficient time, with reasonable diligence, to discover the facts, would constitute in law a ratification of the unauthorized dealing and render him liable."

In the case of Tabor v. Kelly, 109 Iowa, 544, 80 N. W. 520, the Supreme Court of Iowa said:

"It is elementary that if the bank, with knowledge of the terms on which Coats received the Baldwin note, took and retained the same without objection, it will be held to have ratified what Coats did. Indeed, there is authority for saying that the bank, when it received this paper, was under obligation to inquire and ascertain the facts of the transaction with Coats, and is bound by the knowledge which such an inquiry would have given."

In the case of Ballard v. Nye, 138 Cal. 596, 72 Pac. 159, the Supreme Court of California said:

"Now, upon the matter of ratification: Appellant contends in this connection that payment to Hayford by the company was not payment to her, unless he had authority to represent her. There is no doubt of this as a legal proposition. Of course, authority must be shown; but it need not be express authority. It may be implied, and one of the recognized legal methods of proving authority is by ratification. From such proof the law implies previous authority to the same extent as if in the first instance it had been expressly conferred. The doctrine of ratification proceeds upon the theory that there was no previous authority, and that the relation of principal and agent did not in fact exist, but implies it from the acts and conduct of the parties, and, when so implied, is equivalent to previous authority, and results as effectively to establish the relation of principal and agent as if the agency had been authorized in the beginning. But the general doctrine of ratification is so well understood as to need no further reference to it. While on the subject, however, it may be said, as to the character of proof from which ratification may be inferred, that it is the most frequently established by implication from the conduct and acts of the party in whose behalf the unauthorized agency was assumed, inconsistent with any reasonable intention on his part other than that he intended approving and adopting it. * * * With all these facts directly and strongly showing that Hayford had no right to the possession of this money—facts which should have suggested investigation and inquiry as to how he acquired it—the appellant made none. We are mindful of the general rule that a party must have full knowledge of all the material facts before the doctrine of ratification can be applied. 'Ignorance of such facts, however, can avail nothing where it is intentional and deliberate, or where the circumstances are such as reasonably to put the principal upon inquiry.' Mechem on Agency, section 148. This general rule is intended to protect the vigilant, not to aid those who, advised by the situation and surroundings that an inquiry should be made, make none; and ignorance of the existence of facts which might have been ascertained with ordinary diligence is no protection. Where the situation naturally and reasonably suggests that some inquiry or investigation should be made, and none is made, the person failing to make it will be deemed, in law, possessed of such facts as the inquiry would have disclosed."

Upon investigation of the record before us we cannot say that the inferences which the jury was justified in drawing from this evidence do not justify the conclusion reached by them in the consideration of this case. We realize that agency is often a difficult fact to directly establish, and that frequently, on account of the inability to show specifically the true relation between parties, resort must be had to the details and circumstances surrounding the transaction, in order to gather from them such deductions as would justify a conclusion. The facts here upon which the jury found adversely to the company are largely circumstantial, but this court is com-

mitted to the doctrine that facts may be established from circumstances, and in fact in everyday life we all draw conclusions and reach opinions from circumstances that are presented to us.

It is unnecessary for us to comment upon the conduct of the parties here, and it is sufficient for us to say that we cannot see our way clear to molest the verdict in this case as it comes to us, for the verdict of the jury met with the approval of the conscience of the trial court, and we think it is right.

There being no prejudicial error in the instructions, this cause is affirmed.

By the Court: It is so ordered.