## MASSACHUSETTS BONDING & INS. CO. v. VANCE.

No. 9042—Opinion Filed June 25, 1918.

Rehearing Denied Aug. 27, 1918. Amended Petition for Rehearing Denied May 27, 1919.

(180 Pac. 693.)

1. **Insurance—Parol Insurance — Validity —Statute.**

Parol insurance, comprehending the subject of insurance, the time when the risk attaches and ends, the amount of indemnity, the parties, and the premium, contains all the elements essential to a binding contract of insurance, and is enforceable.

2. **Principal and Agent—Appeal and Error —Agency—Extent of Authority—Question for Jury.**

On the trial of a case, where the authority of an agent to bind his principal is made an issue by the pleadings, and where there is any competent evidence bearing upon the issue of agency and the extent of the authority of such agent, and the evidence thereon is conflicting, the issue as to such agency and the extent of his authority are questions to be determined by the jury under appropriate instructions, and its finding thereon will not be disturbed on appeal.

3. **Attorney and Client—Power of Attorney —Compromise—Tender.**

An attorney, who is employed to institute and prosecute a suit has no implied authority to make a compromise or settlement, or to receive a tender.

4. **Estoppel—Contract — Retention of Benefits.**

For the purpose of defeating liability, a party will not be heard to say he never made a contract, and, inconsistent with such assertion, retain the benefits flowing from the alleged transaction.

(Syllabus by Springer, C.)

Error from District Court. Payne County; James B. Cullison, Assigned Judge.

Action by Ollie E. Vance against the Massachusetts Bonding & Insurance Company. Judgment for plaintiff, motion for new trial overruled, and defendant brings error. Affirmed.

P. D. Mitchell and Chas. B. Mills, for plaintiff in error.

Walter Mathews, for defendant in error.

Opinion by SPRINGER, C. In this opinion the plaintiff in error will be referred to as the company, and the defendant in error will be referred to as the insured. This action was commenced in the district court of Payne county, Okla., by the insured, to recover $3,600 upon a parol contract of insurance.

In the petition filed in this case it is alleged: That on the 19th day of August, 1915, E. Evans was the agent of the company, and had authority to solicit and enter into contracts of insurance against accidents or injury, which would bind the company for the payment of the amount agreed upon in event accident or injury intervened during the life of the insured. That on the 19th day of August, 1915, the insured, being a pipe line constructor by occupation entered into a parol contract of insurance with the company, through its said agent, E. Evans, at Cushing, Okla., whereby the company agreed to indemnify the insured against the effects of injury resulting from accidental means which would prevent him from pursuing his occupation, or a similar occupation, should such injury be received prior to the 1st day of October, 1915, by paying the insured the sum of $3,600, should the injury disable him from pursuing his occupation for a period of five years or longer, or, in event the injury disabled him from pursuing such occupation for less than five years, the company should pay the insured the sum of $60 per month during the time of his disability. That as

a consideration for the indemnity against injury to the insured he paid the company the sum of $5.30 as reward or premium for such indemnity, and which should extend from and including the 19th day of August, 1915, up to the 1st day of October of that year. The petition further alleges that on the 21st day of August, 1915, while the insured was pursuing his occupation, he was accidentally injured, which resulted in the permanent loss of his right arm.

To this petition the company interposed a general demurrer, which was presented to the court and overruled, and exceptions saved. The company then filed an answer, in which it is denied that E. Evans was the agent of the company, having authority to enter into contracts of insurance, as alleged and set forth in the petition, and further denying that any such contract of insurance was ever made, and in the answer it is affirmatively alleged that on the 19th day of August, 1915, the insured made an application to the company upon its regular printed form of applications for a policy of accident insurance, to begin at noon on the date of the policy to be issued by the company in pursuance to the application, and that in said application, and as a part and parcel of the same, there was contained the following stipulation and agreement:

"I understand and agree that I have made the foregoing statements as representations to induce the issue of the policy, and to that end I agree that, if any one or more of them be false, all right to recover under said policy shall be forfeited to the company, if such false statements were made with the actual intent to deceive, or if it materially affects either the acceptance of the risk or the hazard assumed by the company; that the insurance hereby applied for will not be in force until the delivery of the policy to me while I am in good health and free from all injury; and that the agents or solicitors of the company are not authorized to extend credit or waive or modify any of the terms hereof. I agree to pay the advance premium of three and 48-100 dollars before the 1st day of each month without notice."

It is further alleged in the answer on the 19th day of August, 1915, the application was mailed to the company from Cushing, Okla., to a branch office at Saginaw, Mich.; that the policy to be issued in pursuance to the application was a home office policy, and that the home office alone had authority to issue policies and enter into insurance contracts; that upon receipt of the application at the branch office at Saginaw, Mich., it was discovered that a mistake as to the occupation of the insured

had been made in the application, and the same was returned to Cushing, Okla., for the purpose of procuring a correction of the mistake, and that said application was destroyed and a new one was made and forwarded to the home office; and that in pursuance thereof a policy was issued on the 26th day of August, 1915, which contained the provision that said policy should be null and void, unless delivered to the insured while he was in good health and uninjured.

To the answer the insured filed a verified reply, in which he specifically denies that he signed the application as alleged and set forth in the answer, and denies specifically that he ever signed but one application, and denied that the application he signed on the 19th day of August, 1915, contained the provision set forth in the answer, and denies specifically that the application he signed contained a mistake as to his occupation, and specifically denies that the policy was ever delivered to him as alleged and set forth in the answer. And the reply reiterates the allegations of the petition, the receipt of the premium, and retention thereof by the insured, and other facts constituting estoppel and waiver by the insured to deny the contract which he alleges was made.

The case was tried to the court and jury at the May, 1916, term, in Payne county, Okla., and the jury returned a verdict in favor of the insured for the full sum of $3.600. In due time a motion for a new trial was filed and presented to the court, which was overruled and denied, and exception saved, and the case is now properly before this court for review.

The first question presented for the consideration of this court is the contention of the company that the petition did not state facts sufficient to constitute a cause of action, for the facts therein alleged are against the plain commands of the statutory law of this state and against the policy of the law. The precise question here presented involves the validity of a parol contract of insurance. The origin of insurance is wrapped in the obscurity of the past to such an extent that an examination of the most learned authors upon this subject leaves one in doubt as to its true origin. Some of the authors contend that insurance was known to and practiced by the ancients, still others contend that it had its origin during the days of the Roman republic, and still others contend that it had its inception in the necessities of maritime commerce, and the risks and hazards consequent upon it. While we may not be able to trace to a definite source the invention of insurance, we know that it was practiced in various forms down through the ages and in almost all forms of human activity, and did not need to be in any particular form, so long as it embodied all the elements of an enforceable contract, until it became more modernized in the twelfth century. when written contracts or policies of insurance first made their appearance among the merchants in Northern Italy. Insurance had its origin in the necessity of commerce. and has expanded with its progress and facilitated itself to the wants and needs of an advancing civilization, and has been extended into every field of human endeavor, protecting all forms of commerce, agriculture, and life. Wherever danger is apprehended or protection required. it holds out its fostering hand and promises indemnity. This is the principle that underlies the contract, and it can never, without violation to its true spirit and intent. be made by the insured a source of profit; its sole aim being to protect against loss. damage, or injury.

Much doubt and uncertainty regarding the precise question here presented seems to have at one time existed among the courts and text-writers upon this important subject. which led to a riot of confusions in the decisions of courts of last resort, and text-writers as well. This question first came before the Supreme Court of the state of Missouri in the case of Henning v. United States Ins. Co., 47 Mo. 425, 4 Am. Rep. 332, and Justice Wagner, delivering the opinion of the court, held:

"At common law there is nothing absolutely requiring that the contract should be in writing."

And after stating that there was such confusion and disagreement in the books as to the power of insurance companies to make contracts of insurance by parol, and after reviewing a number of the leading cases upon the subject. and construing the act of that state incorporating the defendant company, it was declared that "all the conditions of the policies issued by said company shall be printed or written on the face thereof," and that authority had been given the company to make by-laws, one of which required the president to sign all policies or contracts by which the company was to be bound, and another required every proposal of insurance to be by written application, signed by the applicant or his agent, and held:

"That by virtue of the act of incorporation

and the by-laws referred to there could be no original and binding contract by parol."

A learned writer (1 Duer on Insurance, 60), writing upon this interesting subject, uses this language:

"Indeed, it may be well doubted whether an action upon a contract merely oral would be now sustained, since the usage of written contracts have become so ancient and so universal in their use that it may be considered to have acquired the force of law."

The view laid down by this author was adopted by the Supreme Court of the state of Ohio in the case of Cockerill v. Conn. Mut. Ins. Co., 16 Ohio, 148, as well upon the ground also of universal usage and the authority of the books, as upon the ground that the charter required the policy to be in writing—the precise question there presented being whether a policy, which had become void by the sale of the property insured, could be revived by parol agreement. But after a careful examination of this authority we are conclusively led to the conviction that it is not supported upon either ground by the authorities, and, indeed, it is no longer an authority in the state of Ohio; it being overruled in the case of Dayton Ins. Co. v. Kelly, 24 Ohio St. 345, 15 Am. Rep. 612.

The question was again presented to the Supreme Court of the state of Missouri in the case of Baile v. St. Joseph Fire & Marine Ins. Co., 73 Mo. 371, and after going exhaustively into the decisions of that state, and as well the various text-writers upon the subject, the Henning Case was overruled, and in the body of the opinion it is said:

"It must be considered as the well-settled doctrine by the nearly universal concurrence of the authorities that oral agreements of insurance are enforceable, although the charter of the company contains similar provisions to those contained in chapter 67, supra. The principle underlying these decisions is this: That the right to make contracts of insurance, like any other right of contracting, exists as at common law, unless prohibited by statute; that the contract of insurance having its origin in mercantile law and usage, the distinction which denies the power to enter into such a contract, except in particular modes and forms, is without foundation, and repugnant to and inconsistent with that general capacity of contracting, which the common law concedes to every person ordinarily competent to enter into binding engagements; that the provisions of the charter of a company that they shall have the right to make contracts of insurance by the signature of a president, etc., are regarded by the courts as merely enabling and not restrictive of the general

power to effect contracts in any other mode not unlawful, dictated by convenience; and that 'the distinction between a contract to insure or to issue a policy of insurance and the policy itself is obvious, and constantly recognized by the courts.' May on Insurance, pars. 14, 22, 23, 128; Kelly v. Commonwealth Ins. Co., 10 Bosw. (N. Y.) 82; Sanborn v. Fireman's Ins. Co., 16 Gray (Mass.) 448 [77 Am. Dec. '419]; First Baptist Church v. Brooklyn Fire Ins. Co., 19 N. Y. 305; Relief Ins. Co. v. Shaw, 94 U. S. 574 [24 L. Ed. 291]; New England, etc., Fire & Marine Ins. Co. v. Robinson, 25 Ind. 536. * * *"

In construing the act by which the insurance company was incorporated within the state of Missouri, the court uses this language:

"Besides that, section 8, supra, requiring the signature of the president, etc., uses no prohibitory words—relates not to agreements to insure, but only to policies when completed and ready for official signature."

In 1906 this question was again presented to the Supreme Court of the state of Missouri, in the case of King v. Phoenix Ins. Co. of Brooklyn, N. Y., 195 Mo. 290, 92 S. W. 892, 113 Am. St. Rep. 678, 6 Ann. Cas. 618. Justice Marshall, delivering the opinion of the court, after going exhaustively into the subject, and citing many courts and text-writers in support of the later rule laid down by that court, and quoting with approval from the Baile Case, went further than that court had ever previously gone, and held:

"That unless prohibited by statute, a corporation has all the rights of contracting under the common law, that an individual has."

And further held:

"That the correct doctrine announced by the great weight of authority is that parol contracts of insurance are valid, unless expressly prohibited by statute. The rule thus announced in this state is in harmony with and amply supported by the great weight of modern authority." 195 Mo. 290, 92 S. W. 892, 113 Am. St. Rep. 678, 6 Ann. Cas. 618.

The validity of a parol contract of insurance was presented to the Supreme Court of the state of Illinois in the case of Fireman's Ins. Co. v. Kuessner, 164 Ill. 275, 45 N. E. 540, wherein it is held:

"The mere fact that a company is authorized by its charter to make contracts of insurance in writing or empowered to issue written policies does not invalidate such contracts when made orally, or alter the common-law principle that oral contracts of insurance are valid."

The enforceability of a parol contract of

insurance was questioned in the case of Security Fire Ins. Co. of N. Y. v. Ky. Fire & Marine Ins. Co. in the Supreme Court of the state of Kentucky, 7 Bush, 81, 3 Am. Rep. 301. In the summer of the year 1861, McFerran Manifee & Co., owning a large quantity of cotton purchased in Georgia for release in New York, to be shipped from Columbus to Appalachicola, Fla., and to be thence shipped in the Mary Lucretia and Metropolis ships to the city of New York, procured from the appellee an oral contract for insurance against the perils of navigation, which the appellant reinsured to appellee, and to fill up the uninsured gap between the landing and transshipment of the cotton at Appalachicola, the owners also obtained from the appellee on the 10th day of October, 1865, an oral contract for insurance against fire risks. On a suit to enforce the parol contract of insurance thus entered into the Supreme Court of the state of Kentucky held:

"An oral contract to issue a policy of insurance is binding and may be specifically enforced, or the court may award damages the same as in an action on an executed policy. A provision in a company's charter requiring that 'all policies and contracts of insurance * * * shall be subscribed by the president' relates only to executed insurances, and does not abridge the common-law right to make an oral executory contract for insurance."

This question was brought to the attention of the Supreme Court of the United States for its disposition in the case of Com. Mut. Marine Ins. Co. v. Union Mut. Co. of N. Y., 19 How. 318, 15 L. Ed. 636, and was argued January 22, 1857, decided February 17, 1857. The question there involved was in equity to compel the specific performance of a contract to make reinsurance on the ship Great Republic. The case originated in the Circuit Court of the United States for the District of Massachusetts. The Circuit Court made a decree in favor of the complainants, and the respondents appealed. The facts involved in that case are not dissimilar to the facts involved in the case for our disposition. It appears that the complainants, a corporation established in New York, having made insurance of the ship Great Republic to a large amount, authorized Chas. W. Story at Boston to apply for and obtain from either of the insurance companies their reinsurance to the extent of $10,000. On the 4th day of December, 1853, Mr. Story made application to the president of the defendant corporation for reinsurance, at the same time presenting a paper partly written and partly printed as embodying the terms of the application. The president of the company, after consulting one of the directors of the company, declined to take the risk for a premium of 3 per cent, but offered to take it for 3½ per cent. Mr. Story, answering him, stated that it was more than he was authorized to give and left the office. Mr. Story apprised his principals by telegraphic dispatch that the risk could be taken for 3½ per cent. for 6 months or 6 per cent. for 12 months. The answer on the same day advised him to enter into the contract for 6 months. Mr. Story informed the president he was willing to pay 3½ per cent. for the reinsurance described in the proposal, and took a pen and altered the 3 per cent. provision in the proposal to 3½ per cent. by adding ½ to 3 on the paper, and the president thereupon assented to the terms contained in the paper, but informed Mr. Story that no business was done at the office on that day, and the next day he would attend to it. After the verbal contract of insurance had been entered into and on the night of the same day the ship Great Republic was destroyed by fire while at a wharf in the city of New York. On the next day, being the 7th day of December, the complainants tendered their notes for the agreed premium and demanded a policy of insurance. The defendant declined to issue the policy; several grounds having been relied upon as a basis for its refusal. Among other grounds relied upon as a justification for the refusal was Rev. St. Mass. c. 37, §§ 12, 13:

"Insurance corporations can make valid policies of insurance only by having them signed by the president and countersigned by the secretary."

In disposing of the contention thus raised the Supreme Court of the United States, through Justice Curtis, said:

"But we are of the opinion that this statute only directs the formal mode of signing policies, and has no application to agreements to make insurance."

In construing the statute above referred to, it seems that the Supreme Court of the United States was placing upon the statutes of the state of Massachusetts the construction that had been placed upon them by the Supreme Court of that state. New England Marine Ins. Co. v. De Wolf, 8 Pick. (Mass.) 63; McCulloch v. Eagle Ins. Co., 1 Pick. (Mass.) 276; Thayer v. Mid. Mut. Ins. Co., 10 Pick. (Mass.) 326. The first syllabus of the same opinion is as follows:

"An agreement by parol to make an insurance, is good. Statute of Massachusetts, which provides that insurance corporations can make valid policies of insurance only

by having them signed by the president and secretary (Rev. Stat. c. 37, §§ 12, 13), only directs the formal mode of signing policies, and has no application to agreements for insurance."

The same question was again presented to the Supreme Court of the United States in the case of Relief Fire Ins. Co. of N. Y. v. Elijah J. Shaw, 94 U. S. 574, 24 L. Ed. 291, Justice Bradley, delivering the opinion of the court, said:

"That a contract of insurance can be made by parol, unless prohibited by statute or other positive regulation, has been too often decided to leave it an open question. That it is not usually made in this way is no evidence that it cannot be so made. To avoid misunderstanding in a contract of such importance and complexity, it is undoubtedly desirable that it should always be in writing; and such is the requirement of many codes of commercial law. But the very existence of the requirement shows that it was deemed necessary to make it. The question came before the Supreme Judicial Court of Massachusetts in 1860, on a contract made under circumstances very nearly similar to those of the present case; and it was adjudged that a parol contract of insurance can be made. Sanborn v. Firemen's Ins. Co., 16 Gray, 448 (77 Am. Dec. 419)."

In this case the contruction of the Massachusetts statute was again under consideration, and the court quoted with approval the language of Judge Hoar, wherein it is said:

"We cannot think that a provision in the charter of an insurance company, authorizing contracts authenticated by the signature of a particular officer, and without any words of restriction, should generally be construed to limit the power of the company, and to prevent them from making contracts within the ordigary scope of their chartered powers. On the contrary, the phraseology of those statutes respecting the execution of policies should be regarded as consisting simply of enabling words, not restraining the power which they confer to make contracts, of which policies are the evidence." Sanborn v. Insurance Co., 16 Gray (Mass.) 454, 77 Am. Dec. 419.

And substantially the same views were expressed by the Court of Appeals of New York in First Baptist Church v. Fire Ins. Co., 19 N. Y. 309. The particular provision of the Massachusetts statute under consideration in the Relief Fire Ins. Co. Case was as follows:

"In an insurance against loss by fire hereafter made by companies chartered or doing business in this commonwealth, the conditions of insurance shall be stated in the body of the policy; and neither the application of the insured nor the by-laws of the company shall be considered as a warranty, or a part of the contract, except so far as they are incorporated in full into the policy, and appear on its face before the signatures of its officers."

In answer to the contention of the appellant that the language of the Massachusetts statute conclusively shows that it contemplated nothing but a written contract of insurance, and that it closed the door absolutely to contracts resting in parol, the court said:

"It is evident that the object of this statute was, not to prohibit parol contracts of insurance, but to prohibit the practice of referring to a set of conditions not contained and set out in the policy, but embodied in some other paper or document. The statute was passed for the benefit of the insured, in order that they might not be entrapped by conditions to which their attention might never be called, and which they might inadvertently overlook and disregard, if they were not embraced in their policies. It applies in terms only to policies, that is, to written contracts of insurance, and has no application whatever to parol insurance. It does not prohibit them, nor affect them in any way."

After going somewhat into the history and origin of the question of insurance, and after reviewing the conflicting views of the various courts and text-writers upon the question of parol insurance, May on Ins. (4th Ed.) vol. 1, § 14, lays down the following rule:

"However great may be the inconvenience to the parties, and however injudicious it may be to leave the terms of the contract to the uncertainties of even the most accurate and retentive memory, it seems, nevertheless, that a contract of insurance, the terms of which are not in writing, is sufficient to bind the parties, when there is no statute law to the contrary."

The general rule with reference to parol accident insurance comes within the scope laid down in the foregoing quotation:

"Within the rule above stated an oral agreement for present or immediate insurance covering accident risk is valid and binding. And the general rule applies that, when a contract of insurance has been agreed on the execution of the policy is not essential to its validity, unless it is part of a contract that execution and delivery are prerequisite to its taking effect." Joyce on Ins. (2d Ed.) vol. 1, § 31b; Mathers v. Union Mut. Accident Ass'n, 78 Wis. 588, 47 N. W. 1130, 11 L. R. A. 83; Washburn v. United States Cas. Co., 106 Me. 411, 76 Atl. 902; Preferred Accident Ins. Co. v. Stone, 61 Kan. 48, 58 Pac. 986.

Our attention has been specially called

to section 3403, Rev. Laws 1910, which provides:

"A contract of insurance is an agreement by which one party, for a consideration, promises to pay money or its equivalent or to do an act valuable to the assured upon the destruction, loss or injury of something in which the other party has an interest, and it shall be unlawful for a company to make a contract of insurance upon or relative to any property interests or lives in this state, or with any resident thereof, or for and person as insrance agent or insurance broker, to make, negotiate, solicit or in any manner aid in the transaction of such insurance, except as authorized by the laws of this state, and if the insurance commissioner shall notify any company of his disapproval of any form of policy, it shall be unlawful for such company to issue any policy in the form so disapproved. All contracts of insurance on property, lives or interests in this state shall be deemed to be made therein.'

The contention made here that the language of this statute, "and if the insurance commissioner shall notify any company of his disapproval of any form of policy, it shall be unlawful for such company to issue any policy in the form so disapproved," is conclusive that our statute contemplates that an enforceable insurance contract can alone be made in writing. We do not believe that our statute is susceptible to such a narrow construction. That part of the staute has no reference whatever to the making of a contract and was not intended to regulate the manner or method of making one, but was intended to give the insurance commissioner the authority to control the form of policy, which was evidence of a contract previously made. That part of the statute which the company seeks to invoke in its favor was not intended for its benefit at all, but for the benefit of the insured. It was intended to give the insurance commissioner control over the forms of policy for the purpose of preventing insurance companies from hampering their policies with the imposition of restraint affecting their liability before a recovery can be had. Neither is there anything in the statute of frauds of this state which prevents an insurance company from entering into a parol contract of insurance, nor is it against the policy of the law of this state, and on the contrary we believe parol contracts of insurance are in harmony with the general policy of our law.

"The issuance and delivery of an insurance policy is not essential to establish liability upon an insurance contract, which may rest in parol, but, where no policy is issued or delivered, it is essential to show that a contract of insurance was entered into." McCracken v. Trav. Ins. Co., 57 Okla. 284, 156 Pac. 640.

After a careful and exhaustive review of all the authorities upon the subject, we are irresistibly forced to the conclusion that the best-reasoned cases, and the overwhelming weight of authority, is in favor of the validity and enforceability of parol contracts of insurance, where it is not obnoxious to statutory enactment. Many of the courts throughout the Union, notably Missouri and Ohio, which formerly adhered to the rule that parol contracts of insurance were not enforceable, have overruled their earlier cases and adopted a rule in favor of their enforcement. Having reached this conclusion, we must hold that there was no error in the order of the court overruling the demurrer to the petition.

Second. The next question presented for our consideration is the authority of the agent, Evans, to enter into an insurance contract binding upon the company. It is alleged in the petition that Evans had the authority to solicit and issue contracts of insurance, and that such a contract was entered into, ascertaining the subject of insurance, the commencement and duration of the risk and the amount thereof, the parties, the interest of the assured, and the premium, all of which is denied by the company. We have been somewhat disturbed in arriving at a satisfactory conclusion on this branch of the case. The company specially pleaded that Evans had no authority whatever, except to solicit contracts of insurance, and further pleaded the making of a written application and attached a copy thereof to its answer, which contained provisions conclusively showing that the home office alone had authority to issue policies upon the application, and further provided the policy issued upon the application should be of no force or effect, unless delivered to the insured while in good health and uninjured, and attached an alleged copy of the application to its answer. The company also attached to its answer what is alleged to be a copy of the policy that was issued in pursuance to the application, which also contains a provision that the risk should not attach unless delivered to the insured while in good health and uninjured. In his verified reply the insured denied signing the application, or any other application containing such a provision, and denied the application that he did sign contained such a provision, and specially denied that such a policy, or that any policy, was ever issued to him. On the trial of the case the insured introduced in evidence a letter

from G. Renfro, general agent of the company, which is as follows: .

"Mr. Ollie E. Vance, Cushing, Oklahoma—Dear Sir: Under date of Sept. 13th I received your preliminary notice of accident, and taking the matter up with my district manager, Mr. W. C Rice, of your City, who informs me that Agent E. Evans secured your application for policy on August 19th, and it was agreed between yourself and him that same would not be sent in until August 2nd, and that policy was not delivered to you until August 28th. Inasmuch as you state that you received your injury before policy was issued in your favor, although I am very sorry, we are unable to be of some assistance to you.

"Yours very truly,
"G. Renfro, Agency Director."

The insured introduced in evidence a certified copy of the certificate of appointment by the company of E. Evans, which is as follows:

"To the Insurance Commissioner of the State of Oklahoma:

"This is to certify that the persons named in the following schedule have been duly appointed agents for the transaction of the business of casualty insurance in the state of Oklahoma, from June 22, 1915, to February 28, 1916, for the Massachusetts Bonding & Insurance Company, * * * so far as they may be legally empowered by their letters of appointment, powers of attorney, and the instructions which may be given them by said company.

"In witness whereof I have hereunto set my hand and caused the corporate seal of said company to be affixed, at the city of Saginaw, in the state of Michigan, this 22d day of June, 1915.

"[Seal of Company.]
"W. H. Howland, Sup."

A great deal of other evidence was introduced pertaining to the manner and method of both Rice and Evans in conducting the business of the company, and the representations they made and the authority they pretended to have and exercise, and also a great deal of literature of the company was introduced, which describes the methods and manner of the company in the transaction of its business, the large amount and volume of business it does, and its large capital stock, and tells how promptly it pays its policy holders in case of loss, and says, "Grants insurance that insures," and closes by admonishing the reader to "see our agent to-day; to-morrow may be too late."

The insured himself testified that on the 19th day of August, 1915, he was the holder of an accident insurance policy in the First Texas State Insurance Company, and

that his policy expired on the next day, and that he was in the habit of carrying accident insurance, and, not wanting to be unprotected, went to a man by the name of Rugle, who was conducting a hotel in the city of Cushing, where he understood the agent of the First Texas State Insurance Company was located. After inquiry he was informed by Mr. Rugle that he did not know any one representing that company, but was informed by him that Evans was writing a good insurance, and Rugle then introduced the insured and Evans and the insured told Evans he wanted to take out some accident insurance. Evans explained to him the kind of accident insurance he was writing, and the insured told him that his policy in the First Texas State Insurance Company would expire the next day, and that he did not want to be without insurance, and unless he was prepared to write insurance that would go into immediate effect he did not want it. Evans informed him the kind of insurance he was writing would go into effect immediately, and requested him to sign an application, and told him that if he would do so, the policy would be written and mailed to him the next day.

The insured further testified that Evans went into details in explaining the advantages of the kind of insurance he was writing over other kinds of insurance, and laid great emphasis and stress upon the fact that his insurance went into immediate effect, and that there was no delay, and that the insured would not be without protection. The conversation took place in the office and presence of Mr. Rice, who is referred to in the letter of Renfro as district manager. The insured testified that a table was shown him, which fixed the rate of premium to be paid from the 19th day of August, 1915, to the 1st day of October of that year, and that the total amount was $5.30, that he paid $3.30 of the money before leaving the office of Rice, that he went to the bank for the purpose of procuring the other $2, and the bank was closed, and the next morning, before going to work he procured a grocery man to cash his check, and that he took the $2 remaining unpaid to the office of Rice and paid it to some one in charge, and received the receipt which had been prepared by Evans the previous evening. The insured testified that Evans told him that the payment of $5.30 would insure him against accident from the 19th day of August, 1915, to the 1st day of October of the same year, and that in case of a permanent loss of an arm or leg or an eye, or anything of that nature, that he would be paid the sum of

$3,600, and that in case of temporary injury he would be paid the sum of $60 per month during the time of his disability, not exceeding a period of five years. The evidence shows that the insured told him that upon these terms he would enter into the contract with him, and that Evans drew up the application embodying the terms of his verbal contract, and requested him to sign it, and to pay the $5.30, and that he would write and send the policy to him the next day.

Thus it is seen the contract ascertained the subject of insurance, the commencement and duration of the risk, the amount of indemnity, the parties, and the premium. The verbal contract contained every element necessary to a binding and enforceable contract between the parties. The insured testified on the trial of the case that he never did receive the policy thus applied for.

On the trial of the case the purported application, which the insured denied that he had signed, was presented to him, and he denied positively that he had ever signed it, and other witnesses, who claimed to be acquainted with the signature of the insured, testified it was not his. And the agent, Evans, testifying for the company, said that the application was not the one the insured signed on the 19th day of August, 1915, but attempted to account for the application in this way: Evans testified the application that was signed by the insured on the 19th day of August, 1915, was sent to the company at its home office, which refused to issue the policy, because a wrong statement concerning the occupation of the insured was contained therein, and that it was sent back for correction. Evans testified that he himself destroyed the application the insured signed on the 19th day of August, 1915, but that he did not know whether the insured signed the application upon which it is contended the policy was issued or not, as he was not present, but left the matter of procuring a corrected application to a party by the name of Crabbs, and that he was gone from the office and was out of town, and when he returned Crabbs handed him the application which it is contended the insured signed, and that he sent it into the company for the purpose of having a policy issued.

The evidence of the insured shows that on the 1st day of August, 1915, he received an injury to the brachial plexus, resulting in paralysis of the right arm, and several physicians, testifying for the insured, say that the injury is permanent.

Upon the trial of the case the company failed utterly to establish the allegations of its answer that the insured had signed the application containing the provisions specially pleaded as a defense, and it also failed to prove the issuance of a policy, or if there was the delivery of it to the insured. On the trial of the case the company attempted to introduce in evidence a purported copy of the policy that it had issued to the insured, but the court rejected the offer, for the reason that no evidence was introduced, laying the foundation for the introduction of secondary evidence.

The agent, Evans, testifying for the company, said that he had no authority whatever to enter into or issue contracts of insurance, but that his sole authority was restricted to that of receiving applications, which were transmittted to the home office for its approval or rejection. He also testified that the insured paid him $5.30 as premium on the 19th day of August, 1915. Evans further testified that the company had never issued him a power of attorney or letter of instructions. Mr. Rice testified that he was district manager for the company, and that he transacted a general insurance and real estate business in the city of Cushing, and that the sole authority of Evans was to receive applications and transmit them to the home office for its acceptance or rejection, and, if accepted, to issue policies thereon.

The evidence being thus presented, the court submitted the question of apparent authority of Evans to the jury under appropriate instructions. It is now urged that the court erred in this submitting the question of apparent authority to the jury. The question of apparent authority was before this court in the case of National Surety Co. v. Miozrany, 53 Okla. 322, 156 Pac. 651, and we said:

"In legal significance, an agent's authority is the sum total of the powers which his principal has caused him or permitted him to seem to possess. It is not limited to the powers actually conferred, and to those to be implied as flowing therefrom, but includes, as well, the apparent powers which the principal by reason of his acts or conduct is estopped to deny. Howe v. Martin, 23 Okla. 561, 102 Pac. 128, 138 Am. St. Rep. 840; Wheeler v. McGuire, 86 Ala. 398. 5 South. 190, 2 L. R. A. 808; Louisville & N. R. Co. v. Tift, 100 Ga. 86, 27 S. E. 765. * * * The instructions of the agent include, not only terms of the power which are intended to be made known to those who deal with the agent, and the deviations from which will render ineffectual his act, but also private instructions or directions to the agent as to the manner in which he shall execute his

commission, but which from their nature, or the desire of the principal, it is manifest that it is not expected the agent shall disclose to persons with whom he deals. Between these there is a material distinction. The former are part of the agent's authority; the latter, however, they may affect the agent, can have no effect to qualify the liability of the principal to third persons to whom they are not, and are not intended to be, communicated. While, as between the principal and the agent, the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof; and, as between the principal and third persons, the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses, and which the principal is estopped to deny, Merchants' Bank v. State Nat. Bank, 10 Wall. 604, 19 L. Ed. 1008; Antrim Iron Works v. Anderson, 104 N. W. 319, 11 Am. St. Rep. 434; General Cartage Co. v. Cos., 74 Ohio St. 284. 78 N. E. 371, 113, Am. St. Rep. 959; Bentley v. Doggett, 51 Wis. 224, 8 N. W. 155, 37 Am. Rep. 827; Fishbaugh v. Spunaugle, 118 Iowa, 337, 92 N. W. 58; Banks Bros. v. Everest, 35 Kan. 687, 12 Pac. 141."

The certificate of appointment of Evans by the company says that he has "been duly appointed agent for the transaction of casualty insurance in the state of Oklahoma," etc., and does not limit his authority in any manner whatever. The company permitted him to hold himself out as having authority to enter into contracts of insurance, and the literature of the company which Evans exhibited to the insured was abundantly sufficient upon its face to lead one to the same conclusion. This case comes clearly within the rule laid down by the Supreme Court of the United States in the case of Union Mut. Life Ins. Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617:

"Insurance companies, who do business by agencies at a distance from their principal place of business, are responsible for the acts of the agents within the general scope of the business intrusted to their care, and no limitations of their authority will be binding on parties with whom they deal, which are not brought to their knowledge."

In discussing the authority of an agent, Cooley's Briefs on Insurance, 345, holds the rule to be:

"Though the powers of an agent may be limited by definite restrictions on his authority and by the nature of his agency, the determination of his powers and consequently the rights of the insured must rest in the first instance on the general principle that the powers of an agent are prima facie coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals. The real question is, not what power the agent has, but what power the company has held him out as having."

The evidence as to the authority of the agent being made an issue by the pleadings, and the evidence thereon being conflicting, it was the duty of the trial court to submit that question to the jury under appropriate instructions.

"Where there is any competent evidence bearing upon the issue of agency, the extent of the authority of such agent, and the evidence is conflicting, the issue as to such agency and the extent of authority of such agent are questions to be determined by the jury." Central Mort. Co. v. Mich. St. Life Ins. Co., 43 Okla. 33, 143 Pac. 175; Iowa Dairy Sep. Co. v. Sanders. 40 Okla. 656, 140 Pac. 406.

"Agency is a fact to be proved, as any other fact; and the apparent authority of an agent is to be gathered from all the facts and circumstances in evidence, and is a question for the jury." W. Iron R. C. Co. v. Leach, 32 Okla. 706, 123 Pac. 419; Ricker Nat. Bank v. Stone, 21 Okla. 833, 97 Pac. 577.

And again:

"While there seems to be no particular dispute on the facts, except as to the agency of Mr. Neville, we think the court below adopted the proper practice in submitting the conflicting evidence on this point to the jury." United States Fidelity & G. Co. v. Shirk, 20 Okla. 576, 95 Pac. 218.

We have carefully examined the instructions of the court submitting the issue of agency and the extent of the authority of such agent to the jury, and are of the opinion that the court did not err, either in the submission of the issue or the form of its submission.

The next proposition presented for our consideration is the question of estoppel raised by both the pleadings and the evidence. If upon the trial of this case the company had proven that an application containing the provisions pleaded as a defense was signed by the insured, that a policy was duly issued thereon and delivered to the insured, and that he had kept and retained the same, an entirely different proposition would be presented for our disposition upon the question of estoppel.

Conceding to be true the contention of the company that Evans never had any

authority to enter into contracts of insurance, nevertheless the company by its own acts is estopped to deny he had such authority, or to deny that such a contract was made. We must dispose of this case on the record as it appears here. The evidence in this case shows, and it is nowhere denied, that, growing out of the transaction on the 19th day of August, 1915, between the insured and Evans, the company was paid the sum of $5.30 as premium, and there has never been a valid tender made to the insured of the premium thus paid.

The testimony in this case conclusively shows that the insured made the necessary proof of the injury and demand for the payment of the policy, and that such proof was made to the general agent of the company on the 13th day of September, 1915; but, notwithstanding such proof and demand, the company never made any offer to return the premium until the day before the trial of this case in May, 1916. The day before the trial of this case the attorney representing the company went to the attorney for the insured and tendered him the amount of the premium, $5.30, and the evidence shows that at that time the attorney for the company was notified by the attorney for the insured that he had no right or authority whatever to consider the question of tender. The company, believing that it had brought itself within the requirements of law, elected to stand upon the attempted tender thus made, and at no time, by pleading or otherwise, did it attempt to make any other tender. In the case of A. B. Ins. Co. v. Thomas, 53 Okla. 11, 154 Pac. 44, this court said:

"But where, in addition to the facts stated, the check given in payment of the premiums was collected, and the proceeds placed to the credit of defendant, pursuant to a prior arrangement with the bank, and, being thus received, has since been retained by defendant with knowledge of all the facts, held to constitute a waiver of such condition precedent, and that defendant is estopped to urge that no risk attached under the contract of insurance."

For the purpose of defeating liability a party will not be heard to say he never made a contract, and, inconsistent with such assertion, retain the benefits flowing from the alleged transaction.

In view of these facts, we must hold that the company is without power to assert that its agent had no authority to make the contract which it is alleged he did, or to say no contract was made, and at the same time keep and retain all the benefits flowing from such alleged contract. By keeping and retaining the premium paid, the company is denied the right to say that Evans had no authority to make the alleged contract, or to deny that there was a parol contract of insurance.

It follows that the judgment of the lower court should be affirmed; and it is so ordered.

By the Court: It is so ordered.