C. H. KELLEY, Appellant, v. G. L. ISENSEE, Respondent,
and
C. H. KELLEY, Appellant, v. G. L. ISENSEE and Lillian M. Isensee, Respondents.

(233 N. W. 245.)

Opinion filed November 20, 1930.

*Richardson, Thorp & Wallam,* for appellant.

*Earl H. A. Isensee* and *Lemke & Weaver,* for respondents.

CHRISTIANSON, J. This is an appeal by the plaintiff from judgments rendered in favor of the defendants in two cases. In the first case the plaintiff, C. H. Kelley, seeks to recover against the defendants, G. L. Isensee and Lillian M. Isensee, his wife, upon a certain promissory note in the sum of $6,000 executed and delivered by them to one Sophie Graening and by her assigned to the plaintiff. In the second case the plaintiff seeks to recover $6,000 and interest against G. L. Isensee upon the ground that said G. L. Isensee assumed and agreed to pay such indebtedness as part of the purchase price of a tract of land. The two cases were tried together. The following material facts are undisputed. In October, 1919, the defendant G. L. Isensee purchased a three hundred twenty acre tract of land in Cass county in this state. The purchase was made for the American Loan & Investment Company, a corporation in which said Isensee was interested, but title

was taken in the name of Isensee. At the time of the purchase there was outstanding a $6,000 first mortgage against the premises. This mortgage Isensee assumed and agreed to pay as a part of the purchase price. The remainder of the purchase price was paid by Isensee and his wife, Lillian, giving their note for $6,000, secured by a second mortgage on the land, and, in addition thereto, paying some $9,000 in cash. The American Loan & Investment Company entered into a contract for the sale of the land to one Gauthun; and thereafter, on November 3, 1919, G. L. Isensee and his wife Lillian, conveyed the premises by warranty deed to said Gauthun. Gauthun assumed and agreed to pay the first and second mortgages; paid some $5,600 in cash and executed his note payable to the American Loan & Investment Company in the sum of $8,525, secured by a third mortgage on the land. On October 22, 1921, Gauthun traded the land to one Tufty, and he and his wife executed a deed to the premises, leaving the name of the grantee in blank, and delivered the same to Tufty in that condition. As a part of the purchase price Tufty agreed to assume and pay the three mortgages outstanding against the land.

Thereafter, one Harrington entered into negotiations with said Tufty with the result that Tufty agreed to sell the land, and Tufty delivered to Harrington the deed which he had received from Gauthun in which the name of the grantee was still left blank. In this deed the name of F. L. Kelley (the wife of the plaintiff) was later inserted and the deed was recorded in the office of the register of deeds of Cass county on August 14, 1922. The name of F. L. Kelley was inserted in this deed some time after Tufty had delivered the blank deed to Harrington and prior to its being recorded. In the late fall of 1921 the same Harrington entered into certain negotiations with the American Loan & Investment Company for the acquisition of the third mortgage which this company had upon the land, namely, the mortgage of $8,525 executed by Gauthun and his wife to that company. As a result of the negotiations entered into by Harrington the American Loan & Investment Company assigned this mortgage to the plaintiff Kelley by a written assignment which was later duly recorded; and in consideration thereof the plaintiff Kelley conveyed two certain residence properties in Fargo (subject to mortgages) to one Grady,—one of the officers of the American Loan & Investment Company. In 1922, the plaintiff Kelley pur-

chased the first $6,000 mortgage upon the premises and the same was duly assigned to him; and in December, 1924, he purchased the second $6,000 mortgage and thus became the owner of the first and second mortgages as well as of the third mortgage. The two actions here were brought by him in August, 1928, upon the notes secured by the first and second mortgages so purchased.

In addition to the foregoing undisputed facts evidence was adduced by both parties relating to matters concerning which there is a dispute between the parties as to some fact, as to the admissibility and probative force of evidence, or as to the ultimate facts established thereby. Evidence was adduced by the defendants to the effect that at the time Harrington negotiated with Tufty he (Harrington) stated to Tufty that he was purchasing the land for the plaintiff Kelley and that Kelley would assume and pay all mortgages against the premises; also, that at the time Harrington negotiated with the American Loan & Investment Company for the purchase of its third mortgage against the premises he stated that he was representing the plaintiff Kelley; that Kelley had obtained a deed to the premises and would take up and pay the outstanding mortgages. This evidence was all objected to by the plaintiff on the ground that the agency of Harrington could not be established by his declarations.

The plaintiff Kelley denied that Harrington was his agent or had any authority to represent him in purchasing either the land or the mortgage. Kelley admits, however, that Harrington approached him about the proposition of exchanging certain dwellings in Fargo belonging to the plaintiff for the third mortgage, but that he (Kelley) assumed that Harrington was representing the owners of the mortgage. So far as the evidence shows, however, all the negotiations with respect to the exchange of plaintiff's properties in Fargo for the third mortgage were had through Harrington, although it appears that plaintiff sent the deeds for his Fargo properties to one Simmons, a real estate broker in Fargo, who took them to the office of the American Loan & Investment Company and then received from it the third mortgage, the assignment thereof, and the note secured thereby. The plaintiff Kelley testified that after he had acquired the third mortgage Harrington told him that he (Harrington) had a deed to the land. He further testified:

"Harrington, . . . told me that he was having trouble financing

the matter of taxes and some repairs, and said—and he asked me if I would loan him the money, or send the money to Mr. Simmons with which to pay these bills, and I consented to do it. Shortly after that he came to me and told me that he would like to make an arrangement to sell the property, fee title to somebody, and have that somebody take over the matter of farming the thing, with the understanding that if the property could be sold, when it was sold, the party furnishing the money for the carrying of it would be reimbursed from the rents and if there was any deficit from the sale price, and any profit in the transaction, any profit over the expenses would be divided between the purchaser of the land and Mr. Harrington, and after discussing the thing and going over it to some extent, I arranged for my wife to furnish this money and take the deed, and if the property was sold at a profit, Harrington was to have the handling of that, and the net profit was to be divided fifty-fifty, between my wife and Mr. Harrington. That proposition is still open."

The defendants introduced in evidence two letters written by the plaintiff Kelley to Tufty. The first letter, dated September 14, 1922, purports to be in reply to a letter from Tufty, dated September 10, 1922, wherein he (Tufty) apparently had made some claim that he had not been paid the consideration Harrington had agreed should be paid for the land. In this letter Kelley said:

"My wife and I have put our money into this Tower City farm in absolute good faith with no knowledge whatever of your claim or that of any one else except as shown by the county records. Mr. Harrington has no interest whatever in this half section and, if you have any fight with him, it is for you and him to fight out. I am in no way concerned in it."

The second letter is dated September 19, 1922, and purports to be in answer to a letter from Tufty, dated September 16th. In this letter Kelley said:

"I am in receipt of your letter of the 16th inst. As I view it this Tower City farm is worth but little, if anything over and above the mortgages which, as I understand it, are all past due because of non-payment of interest. The first mortgage comes due now very soon regardless of payment of interest. I traded for the third mortgage early last spring and the assignment of same was at once placed of record.

Subsequently I learned that the land had been sold for taxes and that interest and other taxes were not paid. In order to avoid immediate foreclosure I purchased the outstanding past due unpaid interest coupons and I also purchased seed in order that the farm might not lie idle this year. *Later, in order to protect myself, I negotiated for the deed to the land and in the course of time procured same for my wife after personally examining the records at Fargo and ascertaining that seemingly there were no other outstanding claims.* If you think you have an interest in this land, I believe that I will be willing to have my wife deed same to you, subject to and you to assume the mortgages, interest and taxes and upon being reimbursed for the amounts paid for seed, etc. What do you say?"

Kelley gave the following version of his negotiations with Harrington regarding the acquisition of the third mortgage:

"Mr. Harrington came to see me in Iowa, as I recall it and told me that he had a mortgage or could get a mortgage, this mortgage, it was this mortgage, and went into detail of course, in exchange for a couple of houses that I owned in Fargo. He explained the situation to me and after looking into it in a measure, I told him that I would deal for the mortgage, deal the lots for the mortgage to Harrington himself. Well, I handled the deal myself, that is the size of it."

The undisputed evidence, however, shows that Kelley sent the deeds for the Fargo properties to one Simmons, a real estate broker in Fargo, and Simmons took the deeds to the American Loan & Investment Company and obtained from it the third mortgage, the note secured thereby and the assignment of the mortgage and transmitted the same to Kelley.

As said, the evidence does not disclose when the name F. L. Kelley was inserted as a grantee in the warranty deed executed by Gauthun and delivered by him to Tufty, by Tufty to Harrington and by Harrington to the plaintiff Kelley. The plaintiff testified that the name had been inserted before the deed was delivered to him but his testimony in that regard is not at all convincing. The plaintiff did not produce the deed and there was not a very satisfactory showing made for the failure to do so. A consideration of the evidence and all the circumstances in the case impresses us that the probability is that the name of the grantee was still in blank at the time the deed was delivered by

Harrington to the plaintiff Kelley and that the name of F. L. Kelley was inserted thereafter.

The case before us presents questions of fact rather than questions of law. The applicable principles of law are well settled. It is elementary that the authority of an agent cannot be established nor the scope or effect thereof extended or enlarged by the statements, declarations or representations of the agent so as to charge the principal; and that before the admissions, declarations or statements of an agent become admissible against an alleged principal, the agent's authority must be established prima facie by other evidence. The great question then in this case is whether there is any substantial evidence,— wholly aside from the statements, declarations or representations of Harrington,—tending to show that Harrington had authority to represent Kelley in the transactions in question; or if no such authority is shown whether Kelley has ratified Harrington's act in such circumstances as to become bound thereby.

As said, Kelley testified that he had no knowledge of the alleged representations and promises of Harrington; and it is asserted that Kelley cannot be held to have ratified the acts of his agent and become bound thereby unless he had knowledge of those acts.

The principle thus contended for is a familiar one in the law of agency, but it is subject to equally familiar exceptions. Thus, a principal who intentionally assumes the responsibility without inquiry, or deliberately ratifies, having all the knowledge in respect to the act that he cares to have, becomes bound by the contract (1 Mechem, Agency, 2d ed. §§ 395, 408). And, a principal, who at the outset has no knowledge of the unauthorized act of an agent, by which the latter induced the other party to the contract to enter into it, cannot later, when he acquires such knowledge, insist upon retaining or securing the fruits of the unauthorized act and reject the residue. "If the principal elects to ratify any part of the unauthorized act, he must, so far as it is entire, ratify the whole of it. He cannot avail himself of it so far as it is advantageous to him, and reject it as to the residue." 1 Mechem, Agency, 2d ed. §§ 409, 410.

"It is not material," said the court of appeals of New York (Elwell v. Chamberlin, 31 N. Y. 611, 619), "that the plaintiffs authorized or knew of the alleged fraud committed by their agent in negotiating the

sale of the note. They cannot be permitted to enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing it to a consummation. They have ratified the sale by seeking to enforce payment of the check given for the thing sold. If an agent defrauds the person with whom he is dealing, the principal, not having authorized or participated in the wrong, may no doubt, rescind, when he discovers the fraud, on the terms of making complete restitution. But so long as he retains the benefits of the dealing, he cannot claim immunity on the ground that the fraud was committed by his agent and not by himself."

These rules are peculiarly applicable to a case where, as here, an alleged principal claims that a person who negotiated a deal was not in fact his agent at all, but was merely a volunteer or self-constituted agent. In such case the principal who adopts the contract so made and insists on retaining the fruits of the unauthorized act is also bound by whatever obligations or liabilities were assumed by his pretended agent in consummating the transaction.

Where an alleged agent, who is a mere volunteer, and not an agent for any purpose, has assumed to act for an alleged principal, the principal who adopts the contract of such self-constituted agent is bound "to make all needed inquiry and investigation into the facts, acts and representations of the person, who without authority has assumed to act for him, before he adopts the contract as his own. If he makes no such inquiry, but blindly accepts the proceeds as his own, there is strong evidence that he has voluntarily ratified, having all the knowledge which he cared to have." 1 Mechem, Agency, 2d ed. §§ 408 et seq.

"We think," said the Supreme Court of Michigan (Busch v. Wilcox, 82 Mich. 336, 21 Am. St. Rep. pp. 563, 565, 47 N. W. 328), "it is the duty of the principal, or the person who becomes so by adopting the contract made in his name and for him, to make all needed inquiry and investigation into the facts, acts, and representations of the person who, without authority, has assumed to act for him before he adopts the contract as his own. For in adopting the contract he not only adopts it as written, but he thereby adopts as his acts all the instrumentalities of the self-constituted agent in obtaining the consent of the opposite party to enter into the contract. By adopting the acts of the self-constituted agent, he seeks to appropriate to himself all the

benefits to be derived from it as fully as if he had himself induced it in the first instance, and with this he must assume all the liabilities which attach to it."

Kelley claims that he never had authorized Harrington to act as his agent. Yet the only conclusion that reasonably can be drawn from the evidence is that Harrington was the instrumentality through which the deal was negotiated which resulted in Kelley acquiring the mortgage in question here.

If, as Kelley says, at the outset he accepted the benefit of Harrington's negotiations without knowledge as to the representations and promises made by him, he (Kelley) seeks, nevertheless, after having such knowledge, to retain all the benefits of the transaction. Kelley does not seek to avoid the transaction which he says Harrington had no authority to make for him. He insists on retaining all the advantages of the deal which Harrington negotiated, but seeks to avoid the obligations which were attached to it.

The trial court made findings of fact and conclusions of law in favor of the defendants. It held that the plaintiff was bound by the agreement which Harrington had made in his behalf, namely, the agreement to assume and pay the indebtedness which plaintiff seeks to enforce in these actions. And we are all agreed that wholly aside from the alleged statements, declarations and admissions of Harrington, there is substantial evidence from which it reasonably may be inferred that in negotiating the deal whereby the plaintiff exchanged his real estate in Fargo for the mortgage held by the American Loan & Investment Company, Harrington represented and acted for Kelley and that Kelley cannot retain the benefits of such transaction without also assuming the liabilities and obligations which were attached thereto. In short, we are agreed that there is substantial evidence in support of the findings of the trial court and that such findings are not contrary to, but in accord with, the preponderance of the evidence.

The judgments appealed from are affirmed.

BURKE, Ch. J., and BURR, BIRDZELL, and NUESSLE, JJ., concur.