Jack G. ASKEW, d/b/a Leonhard & Askew, Architects, Plaintiff-Appellee,

v.

JOACHIM MEMORIAL HOME, Defendant-Appellant.

Civ. No. 9113.

Supreme Court of North Dakota.

Oct. 6, 1975.

Rehearing Denied Oct. 24, 1975.

Sperry & Schultz, Bismarck, and Joseph A. Vogel, Jr., Mandan, for defendant and appellant; argued by Alfred C. Schultz, Bismarck.

Bair, Brown & Kautzmann, Mandan, for plaintiff and appellee; argued by Malcolm H. Brown, Mandan.

PAULSON, Judge.

This is an appeal from an order and judgment of the Mercer County District Court dismissing the counterclaim of the defendant and appellant, Joachim Memorial Home, and granting the motion for a directed verdict of the plaintiff and appellee, Jack G. Askew, doing business as Leonhard & Askew, Architects. Judgment was entered against the defendant for the sum of $17,-850.27, which sum includes the plaintiff's claim, plus interest and costs.

This suit results from a claim by Askew that the Joachim Memorial Home is liable to him for $15,915.20, plus interest and costs, as the final payment of an architect's fee of $27,915.20. The fee was calculated pursuant to the terms of a written agreement signed on June 23, 1968, by Edward Schulz and H. M. Leonhard, under which the architectural firm of Leonhard & Askew, Architects, was to provide certain architectural services to the Joachim Memorial Home in connection with a planned building project.

Schulz is purported to have acted as the agent for the Rev. Joachim Memorial Association [hereinafter "Association"], which operates the Joachim Memorial Home in Beulah as a retirement home for elderly persons. Schulz, in 1968, was president of the Association's board of directors [hereinafter "Board"].

Leonhard, in signing the agreement with Schulz on June 23, 1968, is purported to have acted as an agent for Askew, who was at that time operating his professional firm under the assumed name of Leonhard & Askew, Architects. Leonhard and Askew had been partners in the firm of Leonhard & Askew, Architects, from 1955 until January 1, 1968, when the partnership was dissolved. After January 1, 1968, Leonhard continued until his death on January 23, 1974, to be associated with the firm, Leonhard & Askew, Architects, as an employee of Askew.

Beginning in June 1968, Askew, through Leonhard and other employees, began providing architectural services to the Association. On July 18, 1968, the Board discussed the preliminary plans for the building and was told that an architect had been hired. It was during this initial planning phase that the plaintiff first estimated that the cost of construction would be approximately $394,000.

The Association's minutes show that planning for the construction of a new

building continued during the next two years. The minutes of the January 21, 1969, annual meeting of the Association state, in pertinent part:

"Much discussion was had as to the building of a new Joachim Memorial Home. It was decided at this meeting by everyone present that the Board of the Joachim Memorial should do everything in there [sic] power to build a new Home."

One year later, the minutes of the Association again reflect the continued involvement of the Association in planning for the construction of a new building. The minutes of the January 20, 1970, annual meeting of the Association state, in pertinent part:

"President Schulz reported that the building project is still under way at this time."

The next action reflected in the Board's minutes is a report at the March 2, 1970, Board meeting. At such meeting the Board was told that the architect was drawing up a new set of plans based on earlier discussions to reflect proposed changes.

By September 1970, more complete plans for the structure had been completed and Askew had met with representatives of the Board, as well as with other interested persons in Beulah. At the September 27, 1970, meeting of the Board, details of the building were explained and Askew gave as a verbal cost estimate the figure of $440,000.

In April 1971, Board President Edward Schulz, Board Secretary Helmuth Hilz, and H. M. Leonhard of the architectural firm, met with officials of the Bank of North Dakota to discuss financing the project. The Bank of North Dakota was not willing to commit itself to the project at that time, but suggested that the Board obtain firm bids on the proposal and return to discuss the project after bids had been received.

Bids for the project were let on July 15, 1971. The low construction bid was $471,550.

After receiving bids, the Association continued its efforts to secure financing for the project but was unable to do so. As late as April 20, 1972, the minutes of the Board show that the Association was continuing its search for financial backing to construct the building and that the contractors had agreed to hold open their bids for an unspecified period of time. Finally, however, the Board was forced to conclude, during the summer of 1972, that financing would not be available. The project was then abandoned.

At a meeting of the Board held on October 11, 1971, the Board had authorized payment to Askew of the sum of $12,000, which was a partial payment of his architectural fee. Such sum had been paid after its approval by the Board; at such meeting the Board was advised that Schulz had a copy of the agreement with Askew, but the Board voted to pay such fee without knowing of all of its terms and conditions. However, once the Board discovered that Askew's total fee was $27,915.20, they refused to pay the balance of such fee. The amount of the fee was calculated according to the terms of the agreement signed on June 23, 1968, by Edward Schulz and H. M. Leonhard. That agreement provided for a fee of 7.4 percent of the low bid if the building was actually constructed. If not built, the fee would be a percentage of the total fee, based upon the following schedule:

Schematic Design Phase . . . . . . 15%
Design Development Phase . . . . 35%
Construction Documents Phase 75%
Bidding or Negotiation Phase . 80%
Construction Phase . . . . . . . . . 100%

This project proceeded through the "Bidding or Negotiation Phase" before the project was terminated by the Association.

After a series of meetings between Askew and the Board had failed to resolve the dispute, Askew brought this action on October 6, 1972, to recover that portion of his fee which remained unpaid. The Association answered and counterclaimed for the $12,000 it had already paid to Askew. The

Association claimed that the $12,000 had been paid to Askew by the Board in the mistaken belief that a valid contract existed. The Association also contended that if a valid contract did exist between Askew and the Association, the Association had received no consideration for its payment, that Askew had obtained payment by exerting undue influence on the Board, and that Askew had breached the contract by failing to "arrange financing" for the proposed construction project.

On January 17, 1975, Askew moved at the close of all the evidence for a directed verdict of dismissal of the Association's counterclaim. The trial court granted such motion. Askew also moved for a directed verdict on the complaint, but the trial court denied the motion and recessed court for the day, expecting to reconvene the next morning for submission of the case to the jury. However, later that same evening, the trial judge notified Askew's counsel that he had decided to grant Askew's motion for a directed verdict on the complaint. The Association's counsel was notified by Askew's counsel of the court's decision and that the trial court would not reconvene the following morning as originally scheduled. On January 18, 1975, the trial court entered its order granting Askew's motion for a directed verdict of dismissal on the counterclaim and a directed verdict on the complaint and, accordingly, judgment was entered in favor of Askew. The Association appealed.

This appeal presents four issues for our consideration. They are:

1. Is Askew the proper party to bring suit on the alleged contract?

2. Can the Joachim Memorial Home, a voluntary unincorporated association, be sued?

3. Was there a valid contract entered into between the Association and Askew?

4. Did the trial court err in granting Askew's motion for a directed verdict of dismissal of the counterclaim and a directed verdict on plaintiff's complaint?

## I.

The defendant's first contention is that this suit must be dismissed because the plaintiff, Jack G. Askew, did not himself sign the alleged contract with the Joachim Memorial Home. The instrument was in fact signed by H. M. Leonhard, an employee of Askew when the agreement was signed on June 23, 1968. Prior to that time, Mr. Leonhard had been a partner with Askew in the architectural firm of Leonhard & Askew, Architects. At the time of the agreement, Askew continued to do business under the name of Leonhard & Askew, Architects, although Mr. Leonhard was no longer a partner, but, instead, was an employee of Askew's. Consequently, the Association contends that Mr. Leonhard was not authorized to contract on Askew's behalf, and that any testimony admitted by the trial court on the issue of Mr. Leonhard's authority was improperly admitted; and the Association concludes, therefore, that Askew is not the proper party to commence this action.

We find the Association's contention without merit. The general rule is that a third person, having dealt with one purporting to act as the agent of another, is estopped, as against the supposed principal, to deny the agency. 2A C.J.S. Agency § 62, pp. 645–646; *Streichert v. Higgins,* 121 Or. 303, 254 P. 1023 (1927); *Seidell v. Tuxedo Land Co.,* 216 Cal. 165, 13 P.2d 686 (1932); *Waddell v. Donelly,* 138 Fla. 570, 189 So. 650 (1939); *Olson v. Gehlert,* 3 S.W.2d 279 (Mo. App.1928); *Harlan National Bank v. Carbon Glow Coal Co.,* 289 S.W.2d 200 (Ky.Ct. App.1956).

In considering this question, the Florida Supreme Court, in *Waddell v. Donelly, supra* 189 So. at 650, said:

"The man, whose authority as an agent is questioned, delivered the keys to the property to those who make the challenge

and they paid rent to him for the use of the property. They could not in one breath receive benefits from him as an agent and in the next refute his right to act. As they have dealt with Rawls as the representative of the owner and thereby gained possession of the land, they should not be heard to question his power afterwards while resisting an action in ejectment . . . ."

In the instant case, the Association is challenging Mr. Leonhard's authority to contract on Mr. Askew's behalf. This challenge of authority by the Association occurs after Leonhard had worked with the Association in presenting plans and proposals for its consideration, and had participated in consultations with financial institutions and members of the Association's Board; and after the Association had accepted the professional architectural advice as the benefits of dealing with Leonhard as the agent of Askew. Askew, however, reaffirmed Leonhard's actions by commencing this suit on such agreement.

It is therefore immaterial whether or not the trial court erred in admitting certain evidence as to the principal-agency relationship between Askew and Leonhard after the dissolution of their partnership. The Association is not in a position to question the authority of Mr. Leonhard to act as the agent for Mr. Askew. By accepting the benefits conferred upon it, in dealing with Mr. Leonhard as the agent of Mr. Askew, the Association is estopped to deny that the agency existed. Askew is, therefore, the proper party to bring this action.

## II.

The Association further contends that the Joachim Memorial Home, an institution for the care of the elderly, is immune from suit in this case because the Rev. Joachim Memorial Association, which operates the Home, is a voluntary unincorporated association. The Association operates under bylaws which establish a structure for the management of the Home and which set forth the authority and purposes of the Association and its board of directors.

Article I, Section 1 of the Association's bylaws provides for a broad and fluctuating membership, stating:

"The membership of the Rev. Joachim Memorial Association shall be all Lutherans in Mercer County and adjacent counties in good standing in their respective congregations."

Apparently no membership list is maintained.

Article III of the bylaws sets forth the purposes of the Association:

"Section 1:

To provide a home for the aged; to engage in other work of a benevolent, charitable, and religious nature.

"Section 2:

To provide for the bodily needs of the sick, aged, suffering and infirm.

"Section 3:

That the purpose of said Association or corporation shall be to carry on work among the aged, infirm, or crippled, and to maintain a home for that purpose under the administration of the churches, it being the express intention that said association shall remain at all times a charitable institution."

The bylaws also set forth the powers of the Association, stating, in Article III thereof:

"Section 4:

That it shall own, operate, and manage its property as an association; that all property shall be the property of said association . . .

"Section 5:

To do each and every thing necessary, suitable and proper for the accomplishment of any of the aforesaid purposes or the attainment of any one or more of the objects hereby enumerated or which shall at any time appear conducive to, or expedient in carrying out the purpose for which this corporation is formed."

■ At common law, the well-settled rule was that a voluntary unincorporated association could neither sue nor be sued in its common name unless an enabling statute so provided. 6 Am.Jur.2d, Associations and Clubs § 51, p. 485; 7 C.J.S. Associations §§ 35, 36, pp. 82, 88–89; *Brown v. United States*, 276 U.S. 134, 140, 48 S.Ct. 288, 289, 72 L.Ed. 500, 503 (1928); *Bloom v. American Express Co.*, 222 Minn. 249, 23 N.W.2d 570, 572 (1946); *Lyons v. American Legion Post No. 650 Realty Co.*, 172 Ohio St. 331, 175 N.E.2d 733, 735, 92 A.L.R.2d 492 (1971). This rule, however, has not been inflexibly applied. As early as 1921, the United States Supreme Court, in *United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1921), held that a labor union, because of its activities, was a suable legal entity separate and apart from its membership despite the absence of a specific statute so providing.

The Missouri Supreme Court, facing a similar question in the case of *Clark v. Grand Lodge of Brotherhood of Railroad Trainmen*, 328 Mo. 1084, 1104, 43 S.W.2d 404, 413 (1931), stated:

"We think also that the doctrine of estoppel might well be applied to a case like this. This association, having over one hundred thousand members, with regularly constituted officers and a perfect working organization, has the appearance, from,[1] and method of doing business of a corporation or legal entity. It has chosen a name and does business as a legal entity under and by the use of that name. It holds itself out as capable of contracting in that name, and by that name does enter into insurance contracts, and in that name collects the premiums and accumulates funds to meet such contract obligations. When sued on such contracts in the name which it has used in making same, it ought not to be allowed to say that it is a mere myth—an intangible non-entity incapable of being sued."

The Supreme Court of Oklahoma agreed with the Missouri Court's reasoning, stating, in *Alco Finance Co. v. Moran*, 178 Okl. 575, 63 P.2d 747, 748 (1936):

"It [Alco Finance Company] has chosen a name under which to transact its business as a legal entity and is estopped to deny that it is a legal entity when sued on a transaction arising out of business conducted as such legal entity."

In 1960, the Court of Appeals of Kentucky also applied the doctrine of estoppel, when, in *Lynch Burial Association v. Lee*, 332 S.W.2d 528, 529 (Ky.Ct.App.1959), such Court stated:

"Since the Lynch Burial Association did engage in business, and issued burial insurance policies in such name, it is our opinion that it is precluded from asserting that it cannot be sued as a legal entity on such policies."

In *Bloom v. Northern Pacific Beneficial Association*, 193 N.W.2d 244 (N.D.1972), we held that a mutual benefit association, conducting business in the nature of insurance, was amenable to the service of process and, hence, to the jurisdiction of North Dakota courts as an unauthorized insurer. Such association was therefore subject to suit, despite the fact that it was an unincorporated association organized only for the mutual benefit of its members.

■ While we do not have a statute which explicitly authorizes suit against unincorporated associations, we do note that our Legislature, as early as 1927, enacted statutes which have recognized associations as legal entities which could sue and be sued. For example, section 1, chapter 216, of the North Dakota Session Laws of 1931, provided for actions by and against partnerships and associations, stating:

1. The word "from" in the 5th line of the quotation from *Clark* was perhaps intended to be "form".

"When two or more persons have heretofore done or transacted, or are doing or transacting, or shall hereafter do or transact business as partners or associates under a common name, whether such name comprises the name of such persons or not, they may sue and be sued by such common name and in case such partners or associates are defendants, the Summons may be served on one or more of them . . . ."

In adopting the North Dakota Revised Code of 1943, substantially equivalent provisions were included in two separate titles of the 1943 Revised Code, *i. e.*, Titles 28 and 45 thereof. Section 28–0609, N.D.R.C.1943, dealt with service of process, providing, in pertinent part:

"If the defendant in a civil action is a partnership *or unincorporated association*, service of the summons may be made upon one or more of the partners or associates. . . . " [Emphasis supplied.]

The portion of § 1, chapter 216, of the North Dakota Session Laws of 1931, providing for suit against associations, was codified in Title 45, Partnerships. Section 45–0401, N.D.R.C.1943, provided:

"When two or more persons do or transact business as partners *or associates* under a common name, whether such name comprises or includes the names of such persons or not, they may sue and be sued by such common name." [Emphasis supplied.]

No change in meaning or application was intended, however, by the rearrangement and codification of the 1931 enactment. N.D.R.C. Reviser's Note, § 45–0401.

In 1959, the Legislature adopted the Uniform Partnership Act (Chapters 45–05 through 45–09, N.D.C.C.), which revised Title 45 of the North Dakota Revised Code of 1943, dealing with partnerships. Included in such legislative action was the repeal of § 45–0401, N.D.R.C.1943, which contained the statutory reference to suit by or against associations. We believe, however, that this action by the Legislature does not preclude a determination that an unincorporated association doing or transacting business in this State is amenable to suit in its common name. On the contrary, such legislative action does indicate that the Legislature has taken the lead in moderating the harsh common-law rule which precluded all suits against associations. It is consistent with the history of Rule ·4(d)(2)(D), North Dakota Rules of Civil Procedure, and § 45–0401, N.D.R.C.1943, to permit suit against an association in its common name, doing or transacting business under such common name.

■ A charitable institution, organized as a nonprofit corporation, was found to be doing business even when all of its revenue was devoted to charitable purposes. *Y. M. C. A. of N. D. State Univ. v. Board of County Com'rs.*, 198 N.W.2d 241 (N.D.1972) (tax exemption denied charitable nonprofit corporation's real property used as apartment buildings).

While it is apparent from the record that the Association in the instant case was organized for charitable purposes, with no intent that the individual members, officers, or directors receive a profit from its operations, it is nonetheless also apparent that in carrying out those charitable purposes the organization has operated the Joachim Memorial Home as a similar business operation would be conducted. The activities of the Association in operating the Home, in fact, go far beyond those activities conducted by the mutual benefit association in *Bloom, supra*. In the instant case, the Association holds itself out, under the name Joachim Memorial Home, as a legal entity operating a retirement home. Residents of the Home need not be members of the Association. Fees are charged for the care rendered to the Home's residents. Employees are hired and discharged and salaries paid to these employees. In addition, the Association accumulates funds to carry on its operations, holds title to real property in the name of the Association,

loans money, and collects interest; had obtained licensing by the Health Department of the State of North Dakota as a legal entity authorized to operate the Home; and entered into the planning process for the construction of new facilities to house its operations.

Furthermore, the Association's bylaws make it clear that for all purposes the membership of the Association considers the organization to be a legal entity separate and apart from the individual members themselves. The bylaws not only direct that the property be held and managed in the Association's name, but also declare, in Article IV, Section 2 thereof:

"The private property of the members of said association shall not be liable for the debts of the corporation."

Whether or not this bylaw is effective to relieve the members of liability is not, however, an issue in this case. Nonetheless, the inclusion of the clause in the bylaws is evidence of the membership's intention to hold forth the Association as a legal entity, separate and distinct from themselves as individuals.

We believe that it is apparent that the Rev. Joachim Memorial Association, although a charitable association not organized for the profit of its members, was doing business under the name Joachim Memorial Home as a legal entity. We note that the following factors, which were considered by the Missouri, Oklahoma, and Kentucky courts in the cases previously cited, are also present in the instant case:

1. A membership too large to feasibly join all as defendants.
2. Regularly constituted officers and organization.
3. Accumulation of funds.
4. Has chosen a name under which to do business.
5. Holds itself out as capable of contracting in that name.
6. Is engaged in business under that name.

The defendant contends, however, that the cases of *Vorachek v. Anderson*, 54 N.D. 891, 211 N.W. 984 (1927), and *Fuller v. Reed*, 55 N.D. 707, 215 N.W. 147 (1927), hold that voluntary unincorporated associations cannot sue or be sued because they are not legal entities. In both cases, the specific issue for decision was not the status of the associations as legal entities, but whether or not individual members or officers were personally liable on obligations incurred in an association's name.

In *Vorachek*, this Court held that personal liability did attach to officers who had contracted on behalf of an association. However, this Court also concluded that the association was bound, saying, in *Vorachek, supra* 211 N.W. at 985:

"The defendants entered into the contract intending to bind this association, and by doing so they bound the association, but they themselves are the association, and so they bound themselves."

Furthermore, during the legislative session immediately following the *Vorachek* decision, the Legislature adopted Chapter 213, § 1, of the 1927 Session Laws, the predecessor of Chapter 216, § 1, of the 1931 Session Laws, providing that associations doing or transacting business could sue and be sued in their common name.

Consequently, we believe the better rule is that an association doing business as a legal entity may, if the facts and circumstances warrant, be estopped to deny its own existence. 7 C.J.S. Associations § 5, p. 25; *Clark v. Grand Lodge of Brotherhood of Railroad Trainmen*, 328 Mo. 1084, 43 S.W.2d 404, 413 (1931).

For reasons previously set forth, the Association is therefore estopped to deny that it is a legal entity.

## III.

The Association next contends that it is not liable for the payment of Askew's architectural fee, arguing that the agreement

signed by H. M. Leonhard and Edward Schulz was not effective to bind the Association. Schulz, as the president of the Association's board of directors when the agreement was signed on June 23, 1968, was only authorized, with the Association's secretary, to jointly execute contracts on behalf of the Association. Article II, Section 15, of the Association's bylaws states:

"The President shall join with the Secretary in executing all instruments in writing requiring formal execution on the part of the Association . . . . ."

In the instant case, the Association's secretary never signed the contract, nor did the board of directors specifically approve the contract at any subsequent meeting.

■ However, the unauthorized act of an agent purportedly done for the benefit of a principal can be subsequently ratified by the purported principal. *Leviten v. Bickley, Mandeville & Wimple*, 35 F.2d 825, 827 (2d Cir. 1929); Restatement of Agency 2d, § 82, p. 210; Williston on Contracts, 3d Ed. § 278, p. 253; Seavey, Law of Agency (1964) § 32, p. 57.

It is the Association's contention, however, that, because Askew failed to plead ratification in either his complaint or in his reply to the Association's counterclaim, the issue of ratification is not before this Court.

■ In *Wildfang Miller Motors, Inc. v. Rath*, 198 N.W.2d 210 (N.D.1972), in paragraph 3 of the Syllabus, we held:

"When issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated as if they had been raised by the pleadings. Such amendment of the pleadings as may be necessary to make them conform to the evidence may be made upon motion of any party at any time, and failure so to amend does not affect the result of the trial. Rule 15(b), N.D.R.Civ.P."

In the instant case, it is clear from the record that the issue of ratification was tried, even though a ratification was not specifically pleaded by Askew. We note from reading the transcript that not only the trial judge, but also counsel for both parties, believed that one of the issues before the court was an alleged ratification of the unauthorized agreement. In fact, co-counsel for the Association repeatedly referred to the issue of ratification in his argument to the district court during its consideration of Askew's first motion for a directed verdict, which was made at the close of Askew's case.

■ Evidence was offered during the trial which would prove ratification of the agreement. Both parties, as well as the court, were aware that ratification was an issue intertwined with the basic question of the contract's validity. From a perusal of the record, we believe that the issue of ratification, although not specifically pleaded, was tried with the consent of all parties. We conclude that the issue of ratification is properly before this Court, because it is not necessary to move to amend the pleadings to conform to the evidence, under Rule 15(b), N.D.R.Civ.P.

■ The Restatement of Agency 2d § 82, page 210, defines ratification as:

"The affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."

Williston on Contracts, *supra*.

In the instant case, there was no express ratification by the Board of the agreement entered into by the Association's president with the plaintiff. There is, however, evidence of ratification by conduct or inaction.

■ The ratification of an unauthorized act may occur either expressly, or by implication because of conduct by the principal which is inconsistent with an intention to repudiate the agent's action. *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73, 104 Cal.Rptr. 57, 61, 500 P.2d 1401, 1405 (1972); *Ballard v.*

*Nye*, 138 Cal. 588, 597, 72 P. 156, 159 (1903); *Amazon Fire Ins. Co. v. Bond*, 65 Okl. 224, 165 P. 414, 419 (1917); *Harris v. Seidell*, 1 Cal.App.2d 410, 36 P.2d 1104, 1106 (1934); *Karetzkis v. Cosmopolitan National Bank*, 37 Ill.App.2d 484, 186 N.E.2d 72, 75 (1962); Williston on Contracts, § 278; Restatement of Agency 2d § 93, p. 240.

In *Russell v. Waterloo Threshing Mach. Co.*, 17 N.D. 248, 116 N.W. 611, 612 (1908), this Court held that the defendant was liable on a contract for the purchase of certain machinery even though the acts of the company's agent were totally without authority. The Court also held that the company was estopped to deny that it had ratified the contract for the machinery's purchase because it had "remained silent for so long a time without repudiating Armstrong's acts that it is *presumed* that it intended to and did ratify his acts [emphasis supplied]". The time period which had elapsed in *Russell* between the unauthorized acts and the repudiation was five months.

■ Although as a general rule a ratification cannot occur unless the principal has knowledge of all of the material facts relevant to the transaction, where the principal intentionally assumes the responsibility without inquiry he will be bound by the terms of the originally unauthorized act of his agent. *J. R. Watkins Company v. Vangen*, 116 N.W.2d 641, Syll. ¶ 6 (N.D.1962); *Kelly v. Isensee*, 60 N.D. 149, 233 N.W. 245, 248 (1930); *Martinson v. Kershner*, 32 N.D. 46, 155 N.W. 37 (1915); Seavey, Law of Agency (1964), § 36, p. 66.

In *Russell, supra* 116 N.W. at 613, this Court also stated that the company's lack of knowledge of all of the contract's terms did not preclude a finding of ratification:

"It was informed that its agents had purchased the second-hand rig, and it does not relieve the company from its duty to disaffirm the purchase to say that it did not have express knowledge of the fact that the company was to be held for the purchase price. . . . It must be borne in mind that the interests of Russell required a prompt disaffirmance of the acts of these agents upon ascertaining that they had exceeded their authority. He had parted with his machine, and the same was being used by Hofto, which necessarily means that it was deteriorating in value. By the silence of the company he was justified in believing that the company acquiesced in Armstrong's purchase from him, even had he known that Armstrong was acting in excess of his authority, which is not the fact. . . . "

■ We believe the same rationale applies in the instant case. The architect was providing a valuable service to the Association from and after the time that the unauthorized agreement was signed by H. M. Leonhard and Edward Schulz, as agent for the Home. The Association's board of directors was advised on several occasions that an architect was working on plans for the project. With every operation, the architect was incurring additional expenses, not only expenses for his own time expended, but consultation costs for which he is personally liable.

A review of the evidence shows that the Association's Board acted in such a manner that it voluntarily assumed the responsibility of the terms of the originally unauthorized agreement with Askew without making reasonable inquiry into the nature of the terms contained in that agreement. For example, at the Board meeting of October 11, 1971, the question of a contract with Askew was discussed. The testimony of defense witness Walter Weidrich, a Board member, explains what the Board did at that meeting:

"Q Who brought up the matter of payment to the architect?

"A The chairman, Mr. Schulz.

"Q Ed Schulz. Did any of the members ask any questions in relation to this whole matter of payment?

"A Well, as far as I recall it seems to me Mr. Neuberger asked for the contract.

"Q  What did he ask for?

"A  For the contract.

"Q  Was the contract produced?

"A  No, it wasn't.

"Q  Do you know did anyone say where the contract was at?

"A  Yes, Mr. Schulz.

*   *   *   *  "

On cross-examination of Mr. Weidrich, the following testimony was elicited:

"Q  Do you recall, Mr. Weidrich, what Ed Schulz said at this meeting about where the contract was?

"A  He said he had it at home."

The next witness, August Neuberger, also testified to the events of the October 11, 1971, meeting, stating:

"A  No, I asked him [Chairman Edward Schulz] then why we should pay $12,000.00 as long as there was nothing to show for it and he said that as being a new member I didn't know if I knew there was a signed contract by the board with the architect. Then my question was, 'Where is the contract?' Mr. Schulz said, 'The contract was over at his home.' I said, 'Well, it shouldn't be at the home, it should be with the secretary.' Well, he said, 'That's where it's going to be later on.' "

The board of directors, according to the minutes, thereupon unanimously voted to approve a $12,000 partial payment "on account" to the architect.

By October 11, 1971, it is clear that the Board had not only known for almost four years that the architect had been retained to prepare plans for the Association's proposed building, but the Board also knew that its president had signed an agreement with the architect contracting for architectural services on behalf of the Association. Yet even then the Board failed to take any action to inform Askew that its president was not authorized to enter into such agreement or to terminate the contract. Instead, the Board voluntarily ordered a partial payment of the account, without obtaining a copy of the agreement, although a copy was readily available. The Association had not complained about the quality of Askew's work, but had accepted his professional services and advice for almost four years before it questioned the validity of its contractual relationship with Askew. In addition, there is evidence that the Board actually utilized completed plans and specifications in attempts to find a contractor who would construct the building designed by Askew at a lesser cost than the low bid submitted.

Consequently, the fact that the Board did not know that the contract specified a particular fee is not sufficient reason, under the circumstances of this case, to negate a presumption of ratification. *Russell v. Waterloo Threshing Machine Co., supra.* Seavey, Law of Agency (1964), § 36, pp. 65–66. The Board's action at the October 11, 1971, meeting is evidence that the Association, as did the company in *Russell,* voluntarily assumed the risk without making proper inquiry where the means to learn of the agreement's specific terms and conditions was readily available to it. The Association is therefore estopped to deny that it did not have knowledge of all of the facts. In short, the totality of the Board's actions over the course of almost four years is sufficient evidence from which it can be found that the Association ratified the unauthorized agreement signed by Edward Schulz on the Association's behalf. Therefore, the parties to the contract are permitted to enforce its terms as though the original act of the purported agent had been authorized by the Association.

IV.

The Association's final contention is that the trial court erred in granting Askew's motions for a directed verdict of dismissal on the Association's counterclaim and for a directed verdict on Askew's complaint. Both motions by Askew were made at the

close of all the evidence. Rule 50(a), of the North Dakota Rules of Civil Procedure, states:

"*(a) Motion for directed verdict— When made—Effect.* A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."

■ We held in *Waletzko v. Herdegen*, 226 N.W.2d 648 (N.D.1975), in paragraph 1 of the Syllabus:

"A motion for directed verdict is to be denied unless the evidence is such that reasonable men, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, could not disagree upon the conclusion to be reached."

■ However, a mere scintilla of evidence in favor of the party against whom the motion is made does not preclude the granting of the motion. *Frank v. Daimler-Benz*, 226 N.W.2d 143, 147–148 (N.D.1975). See, Commentaries to Rule 50(a), Civil Rules Manual of State Bar Association of North Dakota (1971).

■ In *Rau v. Kirschenman*, 208 N.W.2d 1 (N.D.1973), in paragraph 3 of the Syllabus, this Court held:

"A motion for a directed verdict should not be granted unless the moving party is entitled to a judgment on the merits as a matter of law. In determining whether or not the moving party is entitled to a judgment on the merits as a matter of law, the evidence should be evaluated in the light most favorable to the party against whom the motion was made."

To the same effect, see *Waletzko v. Herdegen, supra; Nokota Feeds, Inc. v. State Bank of Lakota,* 210 N.W.2d 182 (N.D.1973).

It is the contention of the Association that jury questions were raised on four issues:

a. Whether or not a valid contract existed between the Association and Askew;

b. That there was such a failure of consideration on the part of Askew that the Association received nothing for its promise to pay Askew a fee;

c. That Askew had obtained the $12,000 payment which is the subject of the Association's counterclaim through the exercise of undue influence; and

d. That Askew had breached the contract by failing to "arrange financing" for the construction of the building.

The Association argues that fact questions on any or all of the above issues were raised during the trial, and that, therefore, the granting of Askew's two motions was erroneous.

■ After reviewing all of the evidence, and viewing such evidence in the light most favorable to the Joachim Memorial Home, we hold that Askew was entitled to judgment as a matter of law on all of the issues outlined above, for the following reasons:

First, we believe that the validity of the contract was established by proof that the unauthorized agreement was ratified by the Association. Most of the evidence which supports that conclusion was, in fact, provided by the Association, either through the testimony of the Association's witnesses or by its Exhibits. The evidence stands uncontradicted that:

1. The Board's minutes reflect the fact that the Board, according to its minutes, was aware that an architect was working on plans for a building as early as July 1968.

2. Leonhard and Askew both met on several occasions with the Board or with members of the Board, even if all meetings were not formal Board meetings held in Beulah.

3. Discussions were held at Board meetings and at annual meetings of the Association as to actual plans for the new building which were being prepared by the architects.

4. The architect furnished to the Board probable cost estimates on several occasions, which figures were relatively close to the final cost estimate which was submitted as early as the fall of 1968. The Board at no time objected to the estimated cost of the project.

5. The Association received the final plans and specifications from the architect and used such plans and specifications in attempts to find a contractor who would construct that same building at less cost. The Association continued to retain possession of such plans and specifications throughout the trial.

6. The Board unanimously authorized payment of a portion of Askew's fee at its October 11, 1971, meeting.

Despite the very informal nature of the dealings between the Board and the architects, we believe that after reviewing the record and particularly the evidence adduced from the testimony of the Association's own witnesses, as well as the Association's Exhibits, such evidence is so strong that reasonable men could not differ in concluding that the Association had ratified the contract.

Second, the Association's claim that there was a failure of consideration on Askew's part is not substantiated by the record. The Association made no objection whatsoever to the plans presented by Askew until after the bids were let and the final cost established. Edward Schulz, president of the Association's board of directors, testified that the plans and specifications presented by Askew reflected the desires of the Board. Helmuth Hilz, Walter Weidrich,

and August Neuberger, members of the Board when the bids were let on July 15, 1971, all testified that they believed that the Board was going to continue with its efforts to build the same building that Askew had designed. There is absolutely no evidence that the type of building Askew designed was not the type of building that the Board was seeking to build. Consequently, we cannot see where there was any evidence introduced which substantiates the Association's contention that there was a failure of consideration in this case. Therefore, disposal of that issue by a motion for a directed verdict was proper.

Third, we find that there is virtually no evidence in the record to substantiate the Association's contention that Askew obtained payment of the $12,000 by exercising undue influence over the Board. In fact, neither Askew nor Leonhard were even present at the October 11, 1971, Board meeting at which the payment was authorized. We agree with the trial judge's conclusion that no credible evidence of undue influence had been introduced by the Association. Consequently, this issue, too, was properly disposed of by a motion for a directed verdict.

Fourth, the Association has introduced some evidence that the Association was relying upon the architect to "arrange financing" for the construction of the project. The Association then argues that the failure to obtain financing for the building was a breach by Askew of a condition of the agreement and therefore absolves the Association of liability for Askew's fee.

We note that the contract which, by ratification, became effective on June 23, 1968, provides, in Article 12 thereof:

"This Agreement represents the entire and integrated agreement between the Owner [Joachim Memorial Home] and the Architect [Leonhard & Askew, Architects] and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instru-

ment signed by both Owner and Architect."

No other provision in such contract obligates Askew to "arrange financing" for the construction of the Association's building.

In fact, the uncontradicted evidence in the record shows that Leonhard accompanied members of the Board in visits to financial institutions where attempts were made by the Association to secure financing for the construction of the building.

Consequently, even in viewing the evidence in the manner most favorable to the Association, the most that can be said is that the Association has introduced a mere scintilla of evidence that a condition precedent may have existed and that Askew may have breached that condition. We do not believe, however, that the evidence introduced by the Association could have supported a jury verdict on this question. As we have stated earlier, introduction of a mere scintilla of evidence on behalf of the party against whom a motion for a directed verdict is made does not preclude the granting of that motion. *Frank v. Daimler-Benz, supra.*

We find that the evidence in this case is such that reasonable men could not differ in concluding that the Association was bound by the agreement and that Askew did not breach the contract. Therefore, Askew is entitled, as a matter of law, to judgment.

The Association contends, however, that Askew's motion for a directed verdict on the complaint was improperly granted because the trial court rendered its decision after court had recessed for the day and after it had once denied such motion.

We fail to see, however, that the Association was prejudiced by the trial court's procedure. Even if the case had been submitted to the jury, the trial court could still have granted an equivalent motion, under Rule 50(b), N.D.R.Civ.P. *Hanson v. Fledderman,* 111 N.W.2d 401 (N.D.1961); Commentaries to Rule 50(b), Civil Rules Manual

of the State Bar Association of North Dakota.

Furthermore, Askew's motion was made at the close of all the evidence at trial. The entire record on which the trial court could base its decision was before the court. Counsel's arguments had already been made on the motion, and any additional argument would be limited to the record already before the court. The Association was not prejudiced by the actions of the trial court.

Even if the trial court's action was erroneous, however, it is not reversible error unless it affects the substantial rights of the parties. Rule 61, N.D.R.Civ.P.; *Trautman v. New Rockford-Fessenden Co-Op Tr. Ass'n,* 181 N.W.2d 754, 761 (N.D.1970). In light of our determination that a directed verdict was proper under the evidence presented at the trial, we believe that the substantial rights of the Association were not adversely affected by the trial court's action in granting Askew's motion for a directed verdict on the complaint after court had been recessed.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON and SAND, JJ., and CLIFFORD JANSONIUS, Supreme Court Commissioner, concur.

ROBERT VOGEL, deeming himself disqualified, did not participate; CLIFFORD JANSONIUS, Supreme Court Commissioner, sitting in his place.